# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3721

_____

| | | |
|---|---|---|
| Rolando Hernandez, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | |
| Janet Reno,[1] Attorney General, | * | |
| U.S. Department of Justice; Doris | * | On Petition for Review |
| Meissner,[2] Commissioner, U.S. | * | From the Decision of the |
| Immigration and Naturalization | * | Board of Immigration Appeals. |
| Service; Curtis Aljets, District | * | |
| Director, St. Paul, Minnesota | * | |
| District, U.S. Immigration and | * | |
| Naturalization Service, | * | |
| | * | |
| Respondents. | * | |

_____

Submitted: June 14, 2001

Filed: August 15, 2001

_____

Before MURPHY, HEANEY, and BEAM, Circuit Judges.

_____

[1]On the court's own motion, United States Attorney General John Ashcroft is substituted for his predecessor Janet Reno. See Fed. R. App. P. 43(c)(2).

[2]On the court's own motion, Commissioner of the United States Immigration and Naturalization Service James W. Ziglar is substituted for his predecessor Doris Meissner. See Fed. R. App. P. 43(c)(2).

_____

MURPHY, Circuit Judge.

Petitioner Rolando Hernandez entered the United States without inspection in 1992 after fleeing Guatemala to escape from the Organization for People in Arms (ORPA), which had impressed him into its service. The Immigration and Naturalization Service (INS) initiated deportation proceedings against him in 1993. Hernandez conceded deportability, but requested asylum and withholding of deportation. He was given an individual merits hearing before an immigration judge in June 1994. His testimony at the hearing forms the factual record in this matter, and the judge specifically found his testimony to be credible before granting his requested relief. The Board of Immigration Appeals (Board) issued its decision in October 2000, that Hernandez was statutorily ineligible for asylum. After carefully reviewing the record, we remand to the Board for its further consideration.

I.

Hernandez was born in Quezaltenango, Guatemala on August 20, 1965. Insofar as this case is concerned, his troubles began when two ORPA members approached him on a bus in April 1992 and initiated a conversation. The two men did not identify themselves as members of a guerrilla organization. At that time Hernandez had never heard of ORPA and did not know that it was a guerrilla group which used violent means in pursuit of its goals. During the conversation Hernandez told the two men where he lived and worked.

The two men began visiting him at his workplace and at the restaurant where he usually ate. They also began to pressure him to join their organization, but they misrepresented the nature of ORPA. They said that the group was dedicated to improving the lives of Guatemalans by undertaking non violent activities and protesting

-2-

government injustices.  Although Hernandez was generally sympathetic with the stated goals, he was reluctant to join the organization.  He eventually did so only after the two men threatened to kill him if he did not.  He believed that he would be expected to be involved in organizing strikes, work stoppages, or demonstrations against the government.  He had no idea that he would be asked to participate in violent activities.

About a month after their first meeting, the two men came to a restaurant where Hernandez was eating, forced him into a car, and drove him to a guerrilla camp in a remote mountain location.  Hernandez found approximately fifty ORPA soldiers at this camp, as well as two other individuals who had also been forcibly recruited and kidnapped.  The three newcomers were then oriented to the group and given weapons training.  Hernandez objected and informed the leaders that he did not want to be involved with weapons.  They told him that the training was necessary and that ORPA had to take extreme measures in order to obtain its goals.

The next day Hernandez was taken by the guerrillas to a small village outside of Retalhuleu, where they engaged government forces in battle.  Hernandez objected to taking part, but the leaders said the action was necessary. After the battle, the commander ordered Hernandez and others to dynamite a bridge and to stop cars and loot them.  No one was injured by the dynamiting, but some of the drivers were beaten. Hernandez testified that he had not wanted to join in any of these acts, and only did so because he feared that the guerrillas would otherwise harm or kill him.

Several days later after the commander had received reports that some villagers in Playa Grande were giving information to the army, he ordered a group to go there to retaliate. About fifty people went to Playa Grande, and Hernandez and several others were ordered to remove villagers from their homes and to ransack their houses.  They herded approximately 100 villagers to the town center.  The commander identified about fifteen in this group as government informants, and ordered Hernandez and ten other guerrillas to open fire on them.  All of the suspected informants were killed.

Hernandez did not want to be part of this firing squad, but he knew he was being tested and understood he would be killed if he did not follow the commander's order. He would rather "have turned the fire on [his] own companions," but he knew that "with one machine gun [he] wasn't going to be able" to take care of all of the guerrillas. The commander stood right behind Hernandez during the shooting and examined the magazine of his rifle immediately afterwards to check whether he had followed orders. Hernandez testified that he attempted to aim away from the villagers and tried not to hit anyone, and that he shot approximately 10 to 12 rounds of a 30 round magazine to the left of where he thought the villagers were standing. He indicated that he did not believe that he had hit anyone.

After the shootings in Playa Grande, Hernandez went to the ORPA commander and asked to be set free. He told the commander that he disagreed with the group's violent tactics and that he thought ORPA was doing more harm in Guatemala than good. The commander replied that Hernandez could not leave the group and that he would send him "to hell" if he ever asked to leave again. The commander then ordered two guerrillas to keep guard over him to prevent any escape attempt. Hernandez also went to the two men who had first sought him out and told them that he wanted to leave the group, but they warned him that he would be killed if he continued to talk that way. He considered trying to turn himself over to the government forces, but he feared they would shoot him as a guerrilla.

Several days later the guerrillas engaged in battle with government forces near the Mexican border. Hernandez recognized that this could be the best opportunity for escape, and he ran towards the border. His two guards ordered him to stop, but he shot at them and continued to run. The guerrillas turned their fire on Hernandez and hit him in the lower leg, but he ran on and eventually escaped into Mexico. He had been with ORPA approximately 20 days before he was able to escape.

Hernandez lived and worked in Mexico City for about two months before he learned that two men had been questioning his former employer in Guatemala, Guillermo Cruz, about "Rolando." Hernandez was aware that ORPA had found a previous escapee who had fled to Costa Rica; he had been taken back to Guatemala and killed. Hernandez feared that he would meet a similar fate if ORPA guerrillas succeeded in finding him. He borrowed money from Cruz and attempted to flee into the United States. After several unsuccessful attempts, Hernandez entered the United States on September 5, 1992. He maintained contact with his mother and with Cruz. His mother warned him to stay in hiding because three armed men had been looking for him, and Cruz sent word that "they" were looking for him.

II.

In May 1993, the INS issued an order to show cause against Hernandez, alleging that he was deportable for having entered the United States without inspection under § 241(a)(1)(B) of the Immigration and Naturalization Act (Act).[3] Hernandez conceded deportability, but applied for asylum and withholding of deportation under §§ 208 and 243(h)(1) of the Act. He contended that he was unable to return to Guatemala where he faced persecution by ORPA members because of his political opinion that their actions were harmful to Guatemala, an opinion that he had publicly expressed to his guerrilla commander and other group members.

A hearing was held before an immigration judge in June 1994. Hernandez testified through a translator. The immigration judge found that Hernandez credibly established that he had been forcibly recruited into ORPA by coercion and

---

[3]The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, repealed and renumbered portions of the Immigration and Naturalization Act. Because Hernandez's case was brought before the effective date of the IIRIRA, our references are to pre-amendment law.

misrepresentations, that he had not supported the guerrillas, and that as soon as he became aware of their goals he informed the leaders of his disagreement with them and attempted to leave the group. The judge concluded that Hernandez was entitled to asylum because his credible testimony established a well founded fear of persecution by guerrilla leaders who knew that he had deserted their forces after announcing his opposition to them and also that Hernandez had established that it would be more likely than not that he would be persecuted if he returned to Guatemala. The judge then granted Hernandez's application for asylum and withholding of deportation.

The INS appealed, and the Board of Immigration Appeals (Board) sustained that appeal in October 2000. The Board held that Hernandez was statutorily ineligible for relief because he had "assisted or otherwise participated in the persecution of [a] person on account of . . . political opinion" within the meaning of §§ 101(a)(42) and 243(h)(2)(A) of the Act. It focused its attention on the action in Playa Grande which was the basis for its conclusion that Hernandez had assisted in persecution. Although the Board did not overturn the findings of the immigration judge who had found Hernandez's testimony entirely credible, it indicated that the record was "inconclusive" as to whether he had aimed at or shot any villagers.[4] It concluded that it need not

_____

[4]The Board noted that under direct examination Hernandez testified:

> Q: Did you shoot?
> A: Yes.
> Q: Did you kill anybody?
> A: No. I tried to aim off to the side.
> Q: Did you try to stop them from killing them?
> A: No.
> Q: Why not?
> A: For fear.

Under cross-examination, Hernandez testified:

> Q: [When the command was given to shoot] [d]id you aim at anybody?

decide whether Hernandez had aimed or shot at anyone, because his testimony indicated that he had assisted in persecution on account of political opinion since the villagers had been targeted for suspected aid to the Guatemalan government. The Board found that Hernandez did not meet his burden of proving otherwise, and cited Matter of Rodriquez-Majano, 19 I&N Dec. 811 (BIA 1988), and Fedorenko v. United States, 449 U.S. 490 (1981), for the proposition that "the participation or assistance of an alien in persecution need not be of his own volition to bar him from the relief of withholding of deportation and asylum." The Board ordered Hernandez deported on the basis that he was statutorily ineligible for asylum or withholding of deportation, and it did not therefore reach the issue of whether he was otherwise entitled to asylum.[5]

> A: Yes.

The following colloquy occurred on redirect:

> Q: When you . . . when you . . . again at Playa Grande when you shot your rifle did you aim particularly at anybody?
> [Objection, overruled by Immigration Judge.]
> A: Yes. Yes. Not everyone just chose one person or certain persons to shoot at.
> Q: Do you know if you shot anybody?
> A: It's possible, but I did as much as possible to not hit anyone.

[5]To be eligible for asylum, Hernandez would have to show that he is unable to return to Guatemala because of past persecution or a "well-founded fear" of future persecution by the government, or a group that the government cannot control, on account of his race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1101(a)(42)(A). Facts in his favor include evidence that he had informed ORPA members of his political opinion about opposing their violent tactics, that his mother and his former employer had warned him that men had been questioning his whereabouts after his escape, and that he knew ORPA had found a previous escapee who was taken back to Guatemala and killed. There is incidentally nothing in the record apart from his immigration status to suggest that Hernandez has been anything other than a law abiding resident of this country since his entry in September 1992.

Hernandez argues on his petition for review that the Board erred in holding that he assisted in persecution and in ruling him ineligible for asylum and withholding of deportation. Hernandez contends that the legal standard applied by the Board in determining whether he assisted in the persecution of others is inconsistent with Fedorenko v. United States, 449 U.S. 490 (1981), and the Board's decision must therefore be reversed. Hernandez argues that Fedorenko requires an evaluation of the particular conduct of the petitioner. He maintains that the evidence, when evaluated in accordance with Fedorenko, shows that he never assisted or participated in the persecution of others. The INS maintains that the Board correctly analyzed the case and that Hernandez did not meet his burden of proving that he did not assist or otherwise participate in the persecution of others.

## III.

The Board's conclusion that Hernandez is ineligible for asylum or withholding relief is a legal determination which we review de novo. See Escudero-Corona v. INS, 244 F.3d 608, 613 (8th Cir. 2001). Factual findings underlying its conclusion are reviewed under a substantial evidence standard of review. Id.

An individual like Hernandez who is otherwise deportable may remain in the United States if he can show that he is eligible either for asylum or withholding of deportation under §§ 208 or 243(h) of the Immigration and Naturalization Act. Neither type of statutory relief is available to an individual who participates in certain types of persecution. The definition of a refugee eligible for asylum specifically excludes "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42). Identical language prohibits withholding of deportation for such an individual. See INA § 243(h)(2)(A). If there is any evidence that an applicant for either kind of relief has assisted or participated in persecution, that individual has the burden of demonstrating by a preponderance of the

-8-

evidence that he has not been involved in such conduct. See 8 C.F.R. § 208.13 (asylum); 8 C.F.R. § 208.16 (withholding of deportation).

Fedorenko v. United States, 449 U.S. 490 (1981), is the leading case to have examined the question of whether an individual assisted or participated in persecution. Fedorenko was a Ukranian who became a guard at a Nazi extermination camp in Treblinka, Poland during World War II. After the war he entered the United States in 1949 with a visa issued under the Displaced Persons Act (DPA) and later obtained citizenship. In 1979 the government brought an action to revoke his citizenship on the grounds that he had obtained his naturalization by willfully misrepresenting material facts on his visa and citizenship applications. He had not disclosed his work at Treblinka, and the government contended that that omission was material because it would have made him ineligible for a visa under §§ 2(a) and 2(b) of the DPA. Those provisions specifically excluded individuals who had "assisted the enemy in persecuting civil[ians]" or who had "voluntarily assisted the enemy forces . . . in their operations." Id. at 495.

Fedorenko admitted at trial that he had served as an armed guard at Treblinka during 1942 and 1943 and that he had been aware that thousands of Jews were being murdered there. He testified that he had been issued a uniform and two guns, that he had been paid for his service, and that he had received a merit stripe for good service. He had also been permitted to leave the camp regularly and had not attempted to escape. He admitted that he had shot at escaping inmates during a 1943 uprising, but contended that he had been forced to serve as a guard, had not shared the persecutory motives of the Nazis, and had shot at escapees under orders. He acknowledged, however, that he and other Ukranian guards had significantly outnumbered the Germans at the camp. The district court declined to revoke Fedorenko's citizenship because it found that his service at Treblinka was not voluntary; it reasoned that involuntary acts should not exclude someone from immigration. See United Staets v. Fedorenko, 455 F.Supp. 893, 913 (S.D.Fla. 1978). The law would otherwise keep out

relatively innocent persons such as camp inmates forced to perform jobs which assisted the extermination process in some way.  Id.

The Fifth Circuit reversed, see United States v. Fedorenko, 597 F.2d 946 (1979), and the Supreme Court upheld its position.  The Court criticized the district court's attempt to read a voluntariness requirement into § 2(a) because courts "are not at liberty to imply a condition which is opposed to the explicit terms of the statute."  Fedorenko, 449 U.S. at 512-13.  Although it ruled that there was no condition of voluntariness in the provision, the Court indicated that all aspects relevant to an individual's conduct must be examined in order to determine whether he assisted in persecution.  In a much cited footnote, the Supreme Court stated that "[t]he solution to the problem perceived by the District Court [] lies, not in 'interpreting' the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in *persecution* of civilians."  Id. at 512-13, n. 34 (emphasis supplied).  The Court provided contrasting examples of conduct which would or would not amount to assisting persecution under the Act:

> . . . an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians.  On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

Id.  The court acknowledged that "[o]ther cases may present more difficult line-drawing problems, but we need decide only this case."  Id.

Under Fedorenko, a court faced with difficult "line-drawing problems" should engage in a particularized evaluation in order to determine whether an individual's

-10-

behavior was culpable to such a degree that he could be fairly deemed to have assisted or participated in persecution. Id. See also Riad v. INS, 1998 WL 559348 (9th Cir. 1998). Although Fedorenko dealt with a different statutory provision than that at issue here, courts interpreting the "assistance to persecution" language in §§ 101(a)(42) and 243(h)(2)(A) have followed the type of analysis outlined by the Supreme Court in footnote 34. See Riad v. INS, No. 96-70898, 1998 WL 559348, at *3 (9th Cir. Sept. 1, 1998); Ofosu v. McElroy, 933 F.Supp. 237, 243 (S.D.N.Y. 1995). See also Ofosu v. McElroy, 98 F.3d 694, 701 (2d Cir. 1996) (noting dearth of cases interpreting §§ 101(a)(42) or 243(h)(2)(A) but citing Fedorenko as authority). Courts interpreting these provisions "have evaluated the individual's personal culpability in the atrocities committed to determine if the individual has assisted or participated in persecution." Riad, 1998 WL 559348, at *2 (9th Cir. 1998). As the Ninth Circuit has said in following Fedorenko, an individual's responsibility for such behavior "must be assessed along a continuum of conduct." Id.

After thoroughly going over the record, we conclude that the Board did not apply the correct legal standard in deciding whether Hernandez had assisted or participated in persecution. Although the Board cited Fedorenko in passing, its opinion does not reflect the type of analysis required. The Board should have analyzed all the pertinent evidence related to Hernandez's conduct to determine whether, for purposes of §§ 101(a)(42) and 243(h)(2)(A), he should be held culpable for assisting persecution at Playa Grande. See Fedorenko, 449 U.S. at 512-13, n. 34; Riad, 1998 WL 559348, at *2. The fact that Hernandez had been involved in the shooting in Playa Grande was held by the Board to be "adequate to indicate" that he had assisted in persecution. Without mentioning or analyzing other significant evidence that was relevant to Hernandez's culpability, it concluded that he had not met his burden of proving that he had not participated in persecution and that he was therefore ineligible for asylum and withholding of deportation.

As the Board noted, the burden of proof shifts to an asylum applicant once evidence is presented to show a mandatory ground for denial. This does not mean, however, that a petitioner will necessarily be held responsible for any involvement with a persecutory group. Rather, a court must evaluate the entire record in order to determine whether the individual should be held personally culpable for his conduct for purposes of §§ 101(a)(42) and 243(h)(2)(A). See Fedorenko, 449 U.S. at 512-13, n. 34. In this case, the Board omitted most of the facts in the record from its legal analysis. It did not consider Hernandez's uncontroverted testimony that his involvement with ORPA was at all times involuntary and compelled by threats of death and that he shared no persecutory motives with the guerrillas. Nor did it discuss Hernandez's testimony that he participated in the Playa Grande action in fear for his life, that the commander stood behind him during the shooting and checked the magazine of his rifle afterwards, that immediately after the incident he expressed his disagreement with ORPA's actions to his commander, and that at the first available opportunity he risked his life to escape the guerrillas. It focused only on his being part of the group that shot at the villagers.

The facts here are very different from those in Fedorenko. Although Fedorenko was free to leave Treblinka from time to time, he never tried to escape. Hernandez was never given any leave, and he escaped at his first opportunity. Fedorenko served at Treblinka for over a year, but Hernandez spent only 20 days as a prisoner of ORPA. Unlike Fedorenko, Hernandez never received any payment or reward from ORPA. Heranandez risked his life by articulating his disagreement with ORPA's violent tactics, by disobeying his commander's orders to shoot directly at the villagers, and by fleeing from his captors into Mexico. While Fedorenko and his fellow Ukranians far outnumbered the Germans at Treblinka, Hernandez and two other forced recruits were isolated within a group of fifty guerrillas. And significantly, Hernandez himself revealed his involvement with ORPA to United States officials whereas Fedorenko omitted important information on his entry documents and covered up his connection with Treblinka.

-12-

The case against Hernandez is built upon his own description of the action at Playa Grande and his involvement in it. There is nothing in the record to suggest that the government had any other source of information than his own voluntary testimony. It was Hernandez himself who revealed the facts, both the good and the bad. The immigration judge found his entire testimony completely credible – including his statements that he participated in brutal and violent acts only because of real fear that he would otherwise be killed. The Board did not attempt to discredit the hearing judge's credibility findings, but it chose to look at only part of the story. There is no evidence that Hernandez's participation with ORPA was not at all times compelled by fear of death, to indicate that Hernandez shared any persecutory motives, or to show that he did not escape as soon as possible. The Board should have examined all aspects of Hernandez's testimony when determining whether his conduct constituted assistance in persecution.

If the record is analyzed in accordance with the Fedorenko legal standard, Hernandez may be seen to have met his burden of proving that he did not assist or participate in the persecution of others. Hernandez presented credible and uncontroverted testimony that he was unaware that ORPA was a violent guerrilla organization and that he was forcibly recruited and compelled to join it under threats of death. He testified that he only participated in the action at Playa Grande because he knew he would be killed if he did not. Despite the presence of the commander and other guerrilla soldiers, Hernandez risked his life by disobeying orders and attempting to shoot away from the civilians. The evidence also indicated that Hernandez repeatedly articulated his disagreement with ORPA's violent tactics to the commander and other guerrillas and asked to be set free. The commander responded that Hernandez could not leave, that he would be killed if he asked to leave again, and ordered two armed guerrillas to guard him and prevent him from escaping. Despite these explicit threats, Hernandez escaped at his first available opportunity by placing himself in great danger. He was shot while fleeing and had to leave his family and homeland behind. He had only been with ORPA for approximately twenty days after

his abduction before he fled. It was his misfortune that the group was actively involved in violence in that short time and that he was forced to participate in it.

Since the Board erred as a matter of law by failing fully to analyze the record in accordance with Fedorenko, we remand for its full consideration of the issue of eligibility for the type of relief requested by Hernandez.

## IV.

In conclusion, we vacate the order of the Board of Immigration Appeals and remand to the Board for it to conduct a full Fedorenko analysis to determine whether Hernandez can be held to have "assisted or participated in persecution" within the meaning of §§ 101(a)(42) and 243(h)(2)(A) and for any other proceedings that the Board may find necessary.

BEAM, Circuit Judge, dissenting.

It is my view that the Board of Immigration Appeals (BIA) properly applied the law in this case and fully analyzed the record in accordance with Fedorenko v. United States, 449 U.S. 490 (1981). Thus, I would affirm the decision of the BIA. Accordingly, I dissent.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.