# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-3125

HARPAL SINGH,

*Petitioner*,

v.

ALBERTO R. GONZALES,

*Respondent.*

_____

Petition for Review of a Decision of
the Board of Immigration Appeals.
No. A73-423-013

_____

SUBMITTED MAY 11, 2005[*]—DECIDED AUGUST 5, 2005

_____

Before COFFEY, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Harpal Singh seeks asylum and withholding of removal. An immigration judge, however, found that Singh assisted or otherwise participated in the wrongful persecution of others while a member of a local

_____

[*] On May 9, 2005, we granted Singh's motion to waive oral argument; thus, this appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(f); 7th Cir. R. 34(e).

police force in India. The immigration judge therefore denied asylum and withholding of removal. The Board of Immigration Appeals ("BIA") affirmed, as do we.

In 1979, Singh went to work for a local police department in Punjab, India. In 1982, he became a "head constable." In that position, he managed other constables and performed customary police duties, e.g., patrolling, interrogating, investigating, preparing reports, and taking people into custody.

Sikhism is a minority religion in India, which is dominated by the Hindu religion. There is, however, a substantial Sikh population in India's Punjab region. A Sikh separatist movement grew in Punjab during the course of the twentieth century, with considerable violence erupting in the early to mid-1980s between Sikh militants and the authorities. The intense upheaval persisted until the militants were quelled in the mid-1990s.

Singh, himself a non-militant Sikh, served as head constable during those hostilities. Stopping true militants—who were, for example, perpetrating indiscriminate bombings on railway stations and other public places—is certainly a legitimate police activity. Nevertheless, consistent with our own State Department reports, Singh concedes that the Punjabi police force crossed the line. They systematically arrested without cause innocent Sikhs accused of being militants. The police further tortured and sometimes killed the detainees, then falsely claimed that they violently resisted arrest. Singh denies direct involvement in this acknowledged wrongdoing. Yet, Singh does admit that he brought—supposedly unwittingly but certainly repeatedly—innocent Sikhs into the police station where they were wrongfully beaten by others. Singh similarly concedes that he went on nighttime raids that led to false charges against and beatings of innocent Sikh families. He asserts that his role in these

raids was limited to standing guard outside homes to prevent occupants from escaping while other officers were unjustifiably arresting and beating the family members inside. Additionally, Singh states that while he was personally opposed to his police force's oppression of his fellow Sikhs, he elected to continue working for the police for financial reasons.

Finally, however, when a member of his family was affected, Singh had enough. In November 1993, the police raided a local college, arresting several individuals accused of being Sikh militants, including Singh's cousin. Singh did not participate in this particular raid because he was late for work. Nonetheless, Singh was on duty when his cousin arrived at the police station. The police chief had Singh accompany him into the cousin's interrogation room. There is no indication that the chief or any other officer knew that Singh was related to their subject at that juncture. In the room, Singh's cousin was lying handcuffed and unclothed on the floor. The chief interrogated the cousin for information about militants and their activities and did so while kicking the cousin in the stomach. When the chief became dissatisfied with the cousin's denials, he had the cousin hung upside down and beaten by other officers with wooden rods, causing the cousin to vomit.

To all of this, Singh was an observer, but, at some point during the session, the police chief told Singh to retrieve a belt studded with nails to be used against the cousin. Singh did not comply with the chief's order due to his self-described state of shock at witnessing a relative being tortured. The chief berated Singh, yelling that Singh was "crazy" for not following orders. The chief then dismissed Singh from the room. Later, in the chief's office, the chief told Singh that Singh should consider himself "lucky" because the chief was not going to suspend Singh since it was the first time

that Singh had disobeyed the chief's orders. Prior to his cousin's ordeal, Singh served under the direct command of this particular police chief for approximately nine months. Even before he began working for this chief, Singh says that he knew that this chief was "corrupt and notorious," describing the chief as the most "vicious person in the whole Punjab Police Force" and as having the "worst record of torturing Sikhs and killing them."

Fearing that the chief would continue to live up to this brutal billing, Singh went to speak with his cousin after the interrogation and after another detainee arrested with the cousin had died in the jail. The cousin told Singh that he was innocent, denying all involvement in the militant movement. Shortly thereafter, Singh snuck his cousin out of the police station. Later discovering that Singh had facilitated the escape, the police chief raided Singh's home and arrested Singh. At the police station, the chief interrogated and beat Singh much as he had done with Singh's cousin. The next day, the police released Singh on the condition that, within two weeks, he had to bring his cousin back to the station or otherwise assist the police in capturing the cousin. If he did so, Singh would be forgiven. If he failed, he would be subject to rearrest and further punishment.

In the face of such odious alternatives, Singh fled. From December 1993 to August 1994, he hid at a relative's home in another Indian village. Then, using a false identity, Singh traveled to Thailand. From there, he made his way to Belize, Guatemala, and Mexico and ultimately crossed into the United States in December 1994. According to Singh's conversations with his relatives in India, he is still wanted by the police.

The United States government initiated removal proceedings against Singh in 1999. Singh conceded his removability but sought relief in the form of asylum, 8 U.S.C. § 1158, and

withholding of removal, 8 U.S.C. § 1231. The immigration judge denied each application on the basis of her finding that Singh had assisted or otherwise participated in the wrongful persecution of Sikhs. Singh appealed. The BIA summarily affirmed. Singh now petitions this court for review.[1]

---

[1] The immigration judge did grant Singh relief under the Convention Against Torture ("CAT"). The immigration judge's opinion is ambiguous as to the exact relief awarded; while she labeled it as "withholding of removal" under the CAT, it strongly appears that the relief granted is "deferral of removal" under the CAT. *See* 8 C.F.R. §§ 208.16(d)(2), 208.17(a), 1208.16(d)(2), & 1208.17(a); *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1253 (9th Cir. 2004); 3 Charles Gordon, *et al.*, *Immigration Law and Procedure* § 33.10[4] (Rev. ed. 2005). When Singh appealed to the BIA, the government cross-appealed the CAT ruling to correct this mislabeling. Curiously however, the BIA affirmed on the cross-appeal and did so without comment. The government moreover has not appealed the BIA's cross-appeal decision, and, thus, the CAT matter is not before us. We do however note that despite the apparent grant of deferral of removal under the CAT, there is a still a live case/controversy for us to adjudicate in this appeal. That is because deferral of removal is "a less durable form of relief" and is not as desirable as the other forms of relief that the immigration judge denied. 3 Gordon, *Immigration Law and Procedure* § 33.10[4]; *compare id. with id.* at §§ 33.05[7] & 33.06[6]. Specifically, "[d]eferral of removal has two significant limitations: (1) it does not confer a right to release for aliens in . . . [the government's] custody, and (2) it may be terminated at any time." *Id.* at § 33.10[4][b] (citing 8 C.F.R. §§ 208.17(c)-(f) & 1208.17(c)-(f)). Alternatively, even if the immigration judge's label given to the relief was considered accurate, we would still have a live dispute before us because withholding of removal is different from and generally not as favorable as asylum. *See id.* at

(continued...)

Congress has unequivocally prohibited asylum and with-holding of removal for any alien who "ordered, incited, assisted, or otherwise participated in the persecution" of any individual on account of the individual's "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *see also* 8 U.S.C. § 1158(b)(1) (applying § 1101(a)(42)). The question here is whether Singh "assisted" or "otherwise participated" in the persecution of Sikhs in India.

This case presents our first opportunity to squarely address the terms "assisted" or "otherwise participated" in persecution for purposes of asylum under §§ 1101(a)(42) and 1158(b)(2)(A)(i) and of withholding of removal under § 1231(b)(3)(B)(i) in a published opinion. *See Mousa v. INS*, 223 F.3d 425, 428-29 (7th Cir. 2000) (raising issue but resolving case on another ground); *see also Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir. 1996) (different procedural posture but observing absence of published authority). We have applied these terms in a different statutory context concerning the deportation of former Nazi concentration camp guards and similar officers. *See* 8 U.S.C. §§ 1182(a)(3)(E)(i) & 1227(a)(4)(D); *see, e.g., Naujalis v. INS*, 240 F.3d 642, 646-47 (7th Cir. 2001); *Tittjung v. Reno*, 199 F.3d 393, 397-99 (7th Cir. 1999). In that statutory setting, which exclusively pertains to Nazis from the period of 1933 to 1945, our case law is quite clear: membership in the ranks of Nazi guards is sufficient to constitute assistance in prohibited persecution. *See Naujalis*, 240 F.3d at 646-47; *Tittjung*, 199 F.3d at 397-99 (citing *Kalejs v. INS*, 10 F.3d 441, 444 (7th Cir. 1993); *Kairys*

---

(...continued)
§§ 33.05[7], 33.06[6], & 33.10[4][a]; *see also Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1234 (10th Cir. 2003).

*v. INS*, 981 F.2d 937, 942-43 (7th Cir. 1992); *Kulle v. INS*, 825 F.2d 1188, 1192-93 (7th Cir. 1987); *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir. 1987)). This line of cases, however, is not fully compatible with the present statutory and factual situation for an important reason. Unlike Nazi concentration camps, whose complete existence was premised upon the persecution of innocent civilians, *see Schellong*, 805 F.2d at 661, local Punjabi police departments served traditional, legitimate law enforcement purposes and did not exclusively engage in the persecution of innocent Sikhs, *see id.* (observing difference between Nazi concentration camp guards and local police officers).

Singh's case therefore requires a certain amount of "line-drawing"; a distinction must be made between genuine assistance in persecution and inconsequential association with persecutors. *Fedorenko v. United States*, 449 U.S. 490, 512-13 n.34 (1981) (different statutory setting but seminal case on persecution assistance matters; indicating that persecution cases beyond the Nazi-guard context "may present more difficult line-drawing problems."). In other words, simply being a member of a local Punjabi police department during the pertinent period of persecution is not enough to trigger the statutory prohibitions on asylum and withholding of removal. *See Hernandez v. Reno*, 258 F.3d 806, 813-14 (8th Cir. 2001) (citing *Fedorenko*, 449 U.S. at 512-13 n.34); *see also Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1251-52 (9th Cir. 2004). Rather, for the statutory bars contained in §§ 1101(a)(42) and 1158(b)(2)(A)(i) as well as in § 1231(b)(3)(B)(i) to apply, the record must reveal that the alien *actually* assisted or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion. *See, e.g., Bah v. Ashcroft*, 341 F.3d 348, 351 (5th Cir. 2003) (per curiam). Furthermore, as an applicant has the burden of showing his

entitlement to asylum and withholding of removal, *see Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922, 925 (7th Cir. 2005), it follows that, "[i]f there is any evidence that an applicant for either kind of relief has assisted or participated in persecution, that individual has the burden of demonstrating by a preponderance of the evidence that he has not been involved in such conduct." *Hernandez*, 258 F.3d at 812.

Here, the immigration judge found that Singh assisted or otherwise participated in prohibited persecution. On this record, that finding is supported by substantial evidence. *See Ali v. Ashcroft*, 395 F.3d 722, 726-27 (7th Cir. 2005) ("[We] defer to the BIA's factual findings, reversing them only if they lack the support of substantial evidence in the record. Because the BIA affirmed the [immigration judge's] . . . determination without opinion, the [immigration judge's] opinion becomes the basis of our review.") (citations omitted). By his own admission, Singh was aware that his fellow officers were systematically persecuting innocent Sikhs from about 1983 until the time he fled in 1993. For his part, Singh took innocent Sikhs into custody during that period and transported them to the police station, where he knew they would be subjected to unjustified physical abuse. Further, Singh participated in raids on the homes of innocent Sikh families, guarding homes to prevent escapes while other officers were inside arresting and beating family members without cause. Singh's role in these events qualifies as actual assistance or participation in persecution. Singh complains that others decided who was to be arrested and whose homes were to be raided and that he was simply following orders; he further claims that he did not learn that people he was handling/guarding were innocent Sikhs until after the fact. Even if his assertions are true, they do not excuse his repeated role in such events over the course of a decade. Given the repetition of the conduct over an ex-

tended period and his admitted awareness that police persecution of innocent Sikhs was ongoing during that period, his protestations of case-specific ignorance do not alter the conclusion that he assisted or participated in the persecution. Additionally, Singh vows that he was personally opposed to this persecution, becoming increasing bitter toward the police force on account of its campaign against innocent Sikhs. Nevertheless, during his lengthy term of employment, he refused to quit the police force due to his need for a steady paycheck and his apparent desire to avoid searching for work with a different employer. Just because Singh supposedly did not share in the persecutory motive and his assistance/participation was premised upon pecuniary concerns does not change his fate under §§ 1101(a)(42), 1158(b)(2)(A)(i) and 1231(b)(3)(B)(i) as these statutes indicate "that the alien's personal motivation [for assisting or otherwise participating in the persecution] is not relevant." *Bah*, 341 F.3d at 351.

In addition, Singh's detailed account of the brutalization of his cousin and his subsequent light reprimand from the police chief is particularly telling. The chief required Singh's presence in the interrogation room, not because of a known relation to the cousin, but as matter of routine. This strongly indicates that Singh was regularly present for such sessions with persons who were unjustly accused. Further, Singh testified that he did not respond to the chief's request for a nail-studded belt because he was numbed by seeing his cousin subjected to such treatment and not the treatment itself. Singh's testimony thus suggests that had it been anyone other than one of his own relatives, he would have complied with the chief's order. These conclusions are further supported by the reasoning behind the chief's reprimand. The chief did not suspend Singh because this was the *first* time Singh disobeyed him. Ordering someone

to retrieve a belt lined with protruding nails so it can be used against another is shockingly abhorrent. If this order was the *first* order Singh disobeyed during his nine months with this "notorious" police chief, it is reasonable to assume that Singh obeyed previous orders that were similarly despicable. Singh's account of this entire episode bolsters the conclusion that, before his cousin's ordeal, Singh assisted or otherwise participated in wrongful persecution. The record demonstrates that the immigration judge had substantial evidence to conclude that Singh's conduct is the type that Congress intended to target by including the terms "assisted" and "otherwise participated" in §§ 1101(a)(42), 1158(b)(2)(A)(i), and 1231(b)(3)(B)(i).

For all these reasons, we see no reason to disturb the immigration judge's factual finding that Singh actually assisted or otherwise participated in the persecution of Sikhs in India. Consequently, the applications for asylum and withholding of removal are subject to mandatory denial in accordance with the congressional intent expressed in §§ 1101(a)(42), 1158(b)(2)(A)(i), and 1231(b)(3)(B)(i). Therefore, despite aiding his cousin and suffering on account of that aid, Singh's past wrongs preclude him from obtaining the relief he now seeks. The petition for review is DENIED.

A true Copy:

      Teste:

                    _____

                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*