**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-1729**

_____

ANWAR HADDAM,

              Petitioner,

      v.

ERIC H. HOLDER, JR., Attorney General,

              Respondent.

--------------------------

INTERNATIONAL REFUGEE LAW PRACTITIONERS AND CLINICIANS; PROFESSOR SUSAN BENESCH,

              Amici Supporting Petitioner.

_____

On Petition for Review of an Order of the Board of Immigration Appeals.

_____

Argued: September 18, 2013      Decided: December 4, 2013

_____

Before GREGORY and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Petition denied in part, granted in part, and case remanded by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Thacker and Senior Judge Hamilton joined.

_____

**ARGUED**: Rene Kathawala, ORRICK, HERRINGTON & SUTCLIFFE, LLP, New York, New York, for Petitioner. Christopher C. Fuller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

**ON BRIEF:** Susan M. Akram, BOSTON UNIVERSITY SCHOOL OF LAW, Boston, Massachusetts; Malea Kiblan, KIBLAN & BATTLES, McLean, Virginia, for Petitioner. Stuart F. Delery, Principal Deputy Assistant Attorney General, Michael P. Lindemann, Chair, National Security Unit, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Mark W. Danis, Alexei Klestoff, MORRISON & FOERSTER LLP, San Francisco, California, for Amicus Professor Susan Benesch. Steven H. Schulman, Washington, D.C., L. Rachel Lerman, Amit Kurlekar, Saurish Bhattacharjee, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, for Amicus International Refugee Law Practitioners and Clinicians.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Anwar Haddam is an Algerian national and an exiled leader of the Islamic Salvation Front party ("FIS"). When Algeria was gripped by a military coup in 1992, Mr. Haddam fled to the United States to seek asylum. After a labyrinth of administrative hearings, the Attorney General denied asylum as a matter of discretion. In addition, the Attorney General formulated a new test to determine whether, in spite of not qualifying for asylum, Mr. Haddam qualified for withholding of removal under the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1253(h) (1994)[1]; Matter of A-H-, 23 I. & N. Dec. 774 (A.G. 2005). We conclude that the Attorney General's new test is not a permissible construction of the INA under step two of Chevron. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). However, we also conclude that the Attorney General did not abuse his discretion in denying Mr. Haddam asylum. Accordingly, we deny the petition for review as to the Attorney General's denial of asylum but we remand the matter to the Board of Immigration Appeals ("BIA") to

---

[1] Note that all cites to the INA are to the 1994 version of the law. We apply the version of the INA in effect at the time of Haddam's asylum application. See Matter of A-H-, 23 I. & N. Dec. at 777, n.3.

3

determine whether Mr. Haddam qualifies for withholding of removal.

I.

Mr. Haddam is a nuclear physicist by training who turned to politics after a career in engineering. He was elected to Algeria's parliament in the first round of 1991 elections as a member of the FIS. These were the first free elections that the authoritarian regime had allowed in Algeria, and the FIS won them in a rout. In response to the FIS' victory, the military seized power and canceled the second round of elections. The military then began violent crackdowns against the FIS. Facing the threat of torture or death, Mr. Haddam and his family fled Algeria. He entered the United States in 1992 to apply for asylum.

Meanwhile, the struggle in Algeria turned increasingly violent. Government crackdowns spawned guerilla groups such as the Groupe Islamique Arme (GIA). In the years following Mr. Haddam's entry into the United States, the GIA began to target journalists, intellectuals, tourists, and other civilians. A murky relationship existed between the GIA and Mr. Haddam's FIS. The groups merged for several years to form a united front after Mr. Haddam's exile, but the groups then split after the GIA executed several FIS members.

4

Throughout his exile, Mr. Haddam has been a leader of the FIS, serving in the party's delegation to Europe and the United States. There is evidence that Appellant played a role in the merger between the FIS and GIA from abroad, but this evidence is disputed. In testimony, Mr. Haddam said that "with the help of my leadership (indiscernible), [the GIA and FIS] joined and within one movement." (J.A. 610–11). The government points to this as evidence that the merger occurred because of Mr. Haddam's leadership, but Mr. Haddam points to the broader context of the testimony to argue that "my leadership" refers to Appellant's superiors. (J.A. 609) (referring to "my leaders back home"). In addition, Mr. Haddam was interviewed for dozens of news articles and scholarly publications. In these interviews, when asked about past violent acts in Algeria, Mr. Haddam gives verbal approval of the murder of civilians who either backed the military coup or aided the Algerian military by instructing soldiers on methods of torture.

As a result of these ties between the FIS and GIA, as well as Mr. Haddam's statements supporting or refusing to disavow violence, the Attorney General denied Mr. Haddam asylum as a matter of discretion. Matter of A-H-, 23 I. & N. Dec. at 783; Immigration and Nationality Act, 8 U.S.C. § 1158(a). However, the Attorney General remanded to the BIA to determine whether Mr. Haddam qualified for withholding of removal. Under the INA,

5

even individuals who do not qualify for asylum can avoid deportation upon a showing that they face a threat of persecution. 8 U.S.C. § 1253(h)(1). In turn, this benefit of withholding of deportation does not apply to any individual who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of . . . political opinion." 8 U.S.C. § 1253(h)(2). Thus, it remained to be determined whether Mr. Haddam qualified under the persecutor bar, as this subsection is known.

To aid this determination, the Attorney General formulated a new definition of the persecutor bar based on Mr. Haddam's case. Under the new rule, an individual who is the leader of a political group that has ties with an armed group is denied withholding if there exists "evidence indicating that the leader was instrumental in creating and sustaining . . . ties between the political movement and the armed group and was aware of the atrocities committed by the armed group." Matter of A-H-, 23 I. & N. Dec. at 785. Appellant now challenges the permissibility of the Attorney General's interpretation of the INA and formulation of the persecutor bar inquiry.

II.

We review de novo whether the Attorney General's definition is a permissible interpretation of the INA. See Li Fang Lin v.

6

<u>Mukasey</u>, 517 F.3d 685, 691–92 (4th Cir. 2008). We accord <u>Chevron</u> deference to the Attorney General's interpretation of the INA. <u>See</u> <u>Negusie v. Holder</u>, 555 U.S. 511, 516 (2009); <u>Yi Ni v. Holder</u>, 613 F.3d 415, 423 (2010). First, we ask "whether Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842. If not, we ask whether the Attorney General's interpretation is "a permissible construction of the statute." <u>Id.</u> at 843.

The question before us involves interpretation of the term "ordered, incited, assisted or otherwise participated in . . . persecution of any person." 8 U.S.C. § 1253(h)(2). Specifically, we ask whether this definition can include an individual who meets the following criteria:

1) He is the leader of a political group that has ties to an armed group;

2) He was "instrumental in creating and sustaining the ties between the political movement and the armed group;" and

3) He "was aware of the atrocities committed by the armed group." <u>Matter of A-H-</u>, 23 I. & N. Dec. at 785.[2]

_____

[2] The Attorney General created two more categories of evidence that could disqualify a political leader from withholding of removal. <u>Id.</u> Under the second category, the persecutor bar applies if there is "evidence that [a leader] used his profile and position of influence to make public statements that encouraged . . . atrocities." Category three excludes a leader when there is "evidence that he made (Continued)

7

Here, relying on the plain language of the persecutor bar and guidance from our sister circuits, we conclude that the Attorney General's definition is an impermissible interpretation of the INA. While the terms "assisted" and "otherwise participated" lack mathematical precision, these terms indicate active involvement. As such, the persecutor bar only applies in cases where there is a causal nexus between the applicant's behavior and instances of persecution. The Attorney General's definition does away with this nexus requirement, and for this reason, it is impermissible under the INA.

### A.

Turning to step one of Chevron, we conclude that the language of the persecutor bar does not unambiguously resolve the question before us. Application of the persecutor bar is often a "difficult line-drawing problem[]." See Hernandez v. Reno, 258 F.3d 806, 813 (8th Cir. 2001). Persecutor bar cases are difficult because the level of involvement in an act of persecution is a question of degree, and both sides will often be able to advance reasonable arguments. See, e.g., Negusie, 555 U.S. at 517–18. In Negusie, the Supreme Court considered

statements that appear to have condoned the persecution without publicly and specifically disassociating himself and his movement from the acts of persecution." Id. These two categories are not at issue in this appeal.

8

whether the persecutor bar reaches individuals who participated in persecution but only because they were coerced. Because there was "substance to both [parties'] contentions," the Court concluded that "the statute has an ambiguity." Id. at 517. Here, as in Negusie, we are confronted with a difficult question about the outer limits of the persecutor bar, and given the line-drawing nature of the analysis, there is substance to both parties' contentions. As such, we conclude that the statute does not settle the precise question before us.

Moving to step two of Chevron, we conclude that the Attorney General's definition is nonetheless an impermissible reading of the INA. Our rejection of the Attorney General's definition stems from the plain meaning of the statutory language. Participating in persecution implies actual involvement with the persecution. In common parlance, one cannot participate in an event retroactively. Cf. United States v. Papagno, 639 F.3d 1093, 1099 (D.C.Cir. 2011) (noting in context of a criminal restitution law that "one cannot ordinarily be participating in something that has not yet begun"). Similarly, "assist" means giving "aid or support." American Heritage Dictionary 80 (1976). One cannot ordinarily assist in persecution if one's actions do not further the persecution. As the Supreme Court has noted in interpreting the persecutor bar, to assist or to participate in an activity, an

9

individual must take "'<u>some</u> part in' an activity, or help it to occur." <u>Negusie</u>, 555 U.S. at 544 (quoting <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 178–79 (1993)) (emphasis in original).

The Attorney General's rule strains these definitions. Recall that under the Attorney General's construction, an individual could be barred from relief if, as a leader of a political group, he forges ties with an armed group that commits or has committed atrocities, with awareness of these atrocities. <u>Matter of A-H-</u>, 23 I. & N. Dec. at 785. The definition does not make a distinction based on the timing of the atrocities. Thus, under the Attorney General's construction, the persecutor bar could apply even if the atrocities occurred years before the individual forged ties with the armed group. It could apply if the atrocities occurred before the individual was even born.

For these reasons, every circuit court that has interpreted the persecutor bar in the INA—both before and after the Attorney General's decision—concluded that a necessary element of the persecutor bar is a causal nexus between the individual's actions and an actual instance of persecution. <u>See, e.g.</u>, <u>Higuit v. Gonzales</u>, 433 F.3d 417, 421 (4th Cir. 2006) ("[A] distinction must be made between genuine assistance in persecution and inconsequential association with the persecutors."); <u>Diaz-Zanatta v. Holder</u>, 558 F.3d 450, 455 (6th Cir. 2009) ("[T]here must have been some nexus between the

10

alien's actions and the persecution."); <u>Chen v. U.S. Atty. Gen.</u>, 513 F.3d 1255, 1259 (11th Cir. 2008) (conduct cannot be "merely indirect, peripheral and inconsequential association" but rather "active, direct and integral to the underlying persecution"); <u>Castaneda-Castillo v. Gonzales</u>, 488 F.3d 17, 20 (1st Cir. 2007) (holding that "the term 'persecution' strongly implies both scienter and illicit motivation" and requires "prior or contemporaneous knowledge" of the persecution); <u>Xu Sheng Gao v. U.S. Atty. Gen.</u>, 500 F.3d 93, 99 (2d Cir. 2007) (finding assistance "[w]here the conduct was active and had direct consequences for the victims," not "[w]here the conduct was tangential...and passive in nature"); <u>Alvarado v. Gonzales</u>, 449 F.3d 915, 927–28 (9th Cir. 2006) (requiring "material" assistance and noting that mere membership in a group is inadequate); <u>Singh v. Gonzales</u>, 417 F.3d 736, 739 (7th Cir. 2005) ("[A] distinction must be made between genuine assistance . . . and inconsequential association."); <u>Hernandez v. Reno</u>, 258 F.3d 806, 814 (8th Cir. 2001) (noting that individuals will not "necessarily be held responsible for any involvement with a persecutory group" absent a showing of culpability). This unanimity across circuits springs from the clear statutory language. An individual cannot incite an act that has already occurred. An individual cannot assist an act without having any effect on the act.

11

In Singh the Seventh Circuit required a nexus between an individual's actions and the persecution in question. 417 F.3d at 739. The asylum applicant in Singh was part of a Punjabi police force accused of committing persecution. A causal nexus is vital, the Seventh Circuit concluded, because the police force "served legitimate law enforcement purposes and did not exclusively engage in . . . persecution." Id. As such, membership in the police force alone was not enough to support application of the persecutor bar absent evidence that the applicant actively assisted in persecution. Id. By extension, if membership in a group accused of atrocities is not enough, then membership in a group with ties to a terrorist group is also not enough. See Diaz-Zanatta, 558 F.3d at 456; Singh, 417 F.3d at 739. Like the Punjabi police force, Mr. Haddam's FIS is a political party with legitimate purposes. Even if the FIS had ties with a terrorist group at one point, Mr. Haddam's membership in the FIS would not be enough to show that he actively persecuted or assisted in persecuting others.

Similarly, in Castaneda-Castillo, the First Circuit required more than incidental involvement with persecution. In that case, which was decided after the Attorney General's opinion, the petitioner was part of a police patrol outside a village where a brutal massacre occurred, but the petitioner claimed no knowledge of the massacre. 488 F.3d at 19. The

12

First Circuit found that the persecutor bar cannot encompass actions taken without any knowledge of the specific persecution in question.  Id. at 22.  "Dictionary definitions, as well as the Board's own precedent, bear this out.  So does common sense."  Id. at 20.

Thus, the determinative question in persecutor bar cases is whether the individual's actions have a causal nexus with instances of persecution.  As the case law suggests, factors that aid this determination include intent, knowledge, and the timing of the individual's alleged assistance.  An individual who took actions with no prior or contemporaneous knowledge of persecution is unlikely to have the requisite causal nexus.  See Castaneda-Castillo, 488 F.3d at 20-21.  Scienter and intent can aid the BIA in separating a bona fide torturer from "the bus driver who unwittingly ferries a killer to the site of a massacre."  Id. at 20.  Timing is a helpful indicator as well. In certain cases, after-the-fact behavior might rise to the level of assistance. Examples include an individual who knowingly burns evidence of a massacre or helps a murderer evade being discovered.  See id.  However, if the alleged assistance occurs years after persecution, it is less likely that the behavior could be described as assisting the overall scheme that drives the persecution.

13

While no Court of Appeals has done away with the nexus requirement, the Third Circuit arguably came close to adopting the Attorney General's view in United States v. Koreh, 59 F.3d 431 (3d Cir. 1995). In Koreh, the applicant was a newspaper editor in Hungary before World War II whose newspaper published dozens of anti-Semitic articles. Id at 435. The Hungarian government, which was also anti-Semitic, licensed Koreh to open his newspaper and gave him direction on "what kinds of articles they thought were useful." Id. The court ruled against Koreh because it concluded that publishing propaganda could be counted as assisting persecution insofar as the propaganda incited others to murder. Id. While Koreh did not directly persecute others, the court found a link between the propaganda Koreh published and the wave of persecution that Jewish Hungarians faced. However, even in Koreh, the court refused to apply the persecutor bar without a showing that the persecution occurred after Koreh's newspaper was published. Id. Writings published after the fact would not qualify. In contrast, the BIA relied on Mr. Haddam's after-the-fact language that signaled some support for previous acts of persecution. Thus, even Koreh does not go as far as the Attorney General's definition, since the Koreh court would not apply the persecutor bar to mere approval of past events.

14

Further, the Koreh case involved application of a different statute, the Displaced Persons Act of 1948 (the "DPA")[3], which uses different language and which Supreme Court precedent suggests can be misleading in the INA context. The DPA is problematic as a tool to interpret the INA because the two statutes differ in key language. The DPA bars from relief individuals who "advocated or assisted in the persecution of any person because of race, religion, or national origin." 64 Stat. 227 (emphasis added). The INA's persecutor bar omits the word "advocate," limiting its reach only to those individuals who assist, incite, order, or otherwise participate in the persecution. It is unclear that the Koreh court would have applied the persecutor bar to a propagandist absent language that reaches those who advocate persecution.

In light of this, it is unsurprising that the Supreme Court has cautioned against using case law on the DPA's persecutor bar to aid interpretation of the INA's persecutor bar. See Negusie, 555 U.S. at 520 (noting that persecutor bars in the DPA and INA serve different statutory purposes). Unlike in the DPA context, the persecutor bar in the INA applies to "individuals who have established that they would likely be persecuted if sent back to

---

[3] Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948) as amended by the Act of June 16, 1950, ch. 262, 64 Stat. 219.

15

their native country." Xu Sheng Gao, 500 F.3d at 98. The purpose of the DPA, meanwhile, was to make it easier for immigrants affected by World War II to enter this country without regard to immigration quotas. Negusie, 555 U.S. at 518. Accordingly, there exist reasons to be careful in applying the persecutor bar in the INA context that are inapplicable to DPA cases, because someone denied under the DPA's persecutor bar would not be returning to a country where she faces persecution herself. Thus, the Attorney General misplaces his reliance on authority that not only provides limited support as a general matter but also involves a different statute with different language and a different purpose.

In sum, the BIA's order denying withholding of removal was error because it relied on an interpretation of the INA that is impermissible under step two of Chevron. The language of the INA excludes the Attorney General's definition, and the unanimity across circuits reflects this. We therefore remand to the BIA to decide whether, using a permissible interpretation of the INA, Mr. Haddam qualifies for withholding under § 1253(h)(2). We emphasize that the INA's persecutor bar does not apply absent evidence that an individual took active steps to assist or participate in a specific act of persecution. Mere verbal approval of an act after the fact is not enough, nor is

mere membership in a group with ties to a terrorist organization.[4]

## III.

Although we reverse the BIA's decision to deny withholding of removal, we affirm the decision to deny Mr. Haddam asylum as a matter of discretion. Under the INA, the Attorney General has discretion to grant asylum to individuals who qualify as refugees. Dankum v. Gonzales, 495 F.3d 113, 115 (4th Cir. 2007). This discretion is not a blank check. Zuh v. Mukasey, 547 F.3d 504, 506 (2008). Nonetheless, there exists a small class of cases where the Attorney General can exercise his discretion to deny asylum, even if the withholding remedy also applies. Id. at 509; see Koujinski v. Keisler, 505 F.3d 534, 543 (6th Cir. 2007). For example, an individual's involvement with armed groups might justify a discretionary denial of asylum, even if the individual's involvement is not so severe that he qualifies as a persecutor for purposes of the withholding analysis.

---

[4] Because our conclusion stems from the language of the statute, we need not reach Mr. Haddam's argument that the Attorney General's definition is impermissible under international law and the First Amendment.

17

This is precisely the situation before us. The Attorney General has discretion to deny asylum in extreme cases where there is evidence of involvement in terrorism, even if such involvement does not rise to the level of participation in persecution. In contrast to issues of statutory interpretation, which remain the province of the judiciary, 8 U.S.C. § 1252(b)(4) (2012), our review of the Attorney General's discretionary asylum decisions is more limited. We may not substitute our own judgment for the Attorney General's. Zuh, 547 F.3d at 514. As such, though we must correct the BIA's decisions when they rest on impermissible statutory interpretations, we will not second-guess the Attorney General's discretionary asylum decision unless it was an abuse of discretion. In this case, we conclude that the Attorney General's decision was within the bounds of his discretion.

In making the discretionary asylum decision, the Attorney General must "weigh all relevant evidence under the totality of the circumstances" before denying asylum. Zuh, 547 F.3d at 507. Relevant positive factors include an applicant's "[f]amily, business, community and employment ties to the United States," "[e]vidence of good character, value or service to the community," and evidence of "severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted." Id. at 511. Relevant negative

18

factors include "evidence that indicates bad character or undesirability for permanent residence" and "an actual adverse credibility finding by the [Immigration Judge]." Id. When, as in this case, an individual would otherwise qualify as a refugee, discretionary denials of asylum are "'exceedingly rare' and are generally based on egregious conduct by the applicant." Id. (quoting Huang v. I.N.S., 436 F.3d 89, 98 (2d Cir. 2006)).

Here, the Attorney General did not abuse his discretion. To the contrary, the Attorney General addressed the relevant positive and negative factors in a well-reasoned opinion. Matter of A-H-, 23 I. & N. Dec. at 780–83. On the positive side, Mr. Haddam has family in the United States, including three children who are United States citizens. Id. at 783. Additionally, Mr. Haddam has qualified for protection under the Convention Against Torture, further weighing in his favor. However, as the Attorney General's opinion details, there is evidence that Mr. Haddam had links to armed groups in Algeria who used violence in combating the Algerian government, sometimes targeting civilians. Likewise, the record is replete with examples where Mr. Haddam approved of this violence, even if his approval did not rise to the level of actual participation. The Attorney General concluded that these links and statements "strongly weigh against a discretionary grant of asylum." Id. at 782. Because the Attorney General looked to

19

the totality of the circumstances and balanced the relevant negative and positive factors, his opinion was not an abuse of discretion.  See, e.g., Kouljinski v. Keisler, 505 F.3d 534, 541–43 (6th Cir. 2007).

We also find unpersuasive Mr. Haddam's Fifth Amendment arguments.  Mr. Haddam argues that the Immigration Judges, BIA, and Attorney General denied him due process when they relied on faulty evidence and refused to force the government to disclose favorable evidence.  These arguments are unavailing.  Mr. Haddam must show that there was a defect in his proceedings and that he experienced prejudice as a result of the defect.  See, e.g., Garza-Moreno v. Gonzales, 489 F.3d 239, 241–42 (6th Cir. 2007).  The Federal Rules of Evidence do not apply to immigration proceedings, though immigration judges cannot rely on unreliable evidence.  Anim v. Mukasey, 535 F.3d 243, 256–57 (4th Cir. 2008).

Here, the Attorney General relied on a series of newspaper articles and foreign policy publications as evidence that Mr. Haddam supported violence.  Mr. Haddam argues that these articles lack reliability.  We disagree, finding that the articles that the Attorney General relied on are sufficiently trustworthy.  While the articles, like most journalism, contain layers of hearsay, the articles that the Attorney General cites include articles from the British Broadcasting Corporation,

20

Amnesty International, and Human Rights Watch.  The articles are not inherently suspicious or problematic, and even if a handful of articles are relatively less reliable, the Attorney General relied on dozens of reports to reach his conclusion.  One bad apple will not spoil the bunch.

The allegedly favorable evidence not given to Mr. Haddam consists of statements during telephone conversations made by Mr. Haddam himself.  At best, this evidence would show that Mr. Haddam had limited contact with the FIS or GIA.  However, this does not rebut the basis for the Attorney General's discretionary denial of asylum, since this denial was based on Mr. Haddam's testimony as well as news reports showing that Mr. Haddam had links to both groups.  As such, even if the withholding of exculpatory evidence violates Due Process in this setting, which we do not decide, Mr. Haddam would be unable to show prejudice from the alleged defect.

IV.

For the foregoing reasons, we deny the petition for review in part and we grant the petition in part and remand the case to the BIA to decide whether there is a strong enough nexus between

21

Mr. Haddam's behavior and actual instances of persecution that would warrant application of the persecutor bar.

PETITION DENIED IN PART,
GRANTED IN PART,
AND CASE REMANDED