# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAULINE IM; SITHA NGIN,
　　　　　　　　　　　*Petitioners,*

v.

ALBERTO R. GONZALES, Attorney
General,
　　　　　　　　　　　*Respondent.*

No. 05-70027

Agency Nos.
A79-267-088
A79-267-089

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 17, 2007—San Francisco, California

Filed August 13, 2007

Before: Betty B. Fletcher, Eugene E. Siler, Jr.,* and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge B. Fletcher

---

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

9757

## COUNSEL

Emmanuel Enyinwa, Law Offices of Emmanuel Enyinwa, San Francisco, California, for the petitioner-appellant.

Manuel A. Palau, U.S. Department of Justice, Civil Division, Washington, D.C., for the respondent-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

## I. Facts

In 1975 the Khmer Rouge seized power in Cambodia. Petitioner Im — then 22 years old and one year out of high school — was impressed into service as a forced laborer for the new

totalitarian regime, and his family was killed. Four years later, the Vietnamese army invaded Cambodia, removing the Khmer Rouge from power. Vietnamese troops arrested Im in July of 1979. No criminal charges were ever filed against Im, and the army installed him as a prison guard in PJ, a small prison in Phnom Penh that housed between 35 and 70 prisoners, including a number of Khmer Rouge. All of the guards were Cambodian and none belonged to the Communist party. At the top of the prison hierarchy was the prison chairman, followed by the vice-chairman and five guards. Two of the guards, including Im, worked in the administrative section. The three remaining guards worked in the political section.

Im did not receive payment for his job but was given rice and cooking oil in exchange for his labor. His principal duties included distributing rice to the prisoners, taking them to bathe or receive medical attention, and overseeing their fitness and hygiene routines. Im's job also required him to unlock the cells of prisoners scheduled for interrogation and hand them over to another guard, who would escort them to an interrogation room. The prison had two such rooms: one for regular interrogations and another for "serious" interrogations. Upon completion of an interrogation, Im would lead the prisoner back to his cell.

Although Im did not like his job, he continued working at the prison for a year and a half because he could neither leave his job nor refuse to escort prisoners from the interrogation rooms without risking severe punishment. Im finally managed to leave the prison in March of 1981, a move he pursued because he didn't "want to see the [prisoners] mistreated by others."

He subsequently took a job working at the Royal Hotel but quit after two years to join an underground organization that led guerrilla military activities against the occupying Vietnamese government. In March 1983, Im was arrested by the Ministry of the Interior for participation in anti-government

activities. The Vietnamese tortured Im to acquire information about the anti-government group and ultimately jailed him for eight months. Following his release, Im returned home to his wife and started a small business.

Im joined the Buddhist Liberal Democratic Party ("BLDP") in 1991 and ran for Congress as a member of that party in 1993. During the campaign, government soldiers thrice shot at cars carrying Im and other BLDP members. Im lost the election but was given a job with the Ministry of Rural Development, a position he held until he became deputy general director for the administration of the Ministry of the National Assembly in 1998. At roughly the same time Im also joined a new opposition party, known as the Sam Raimsy Party, with the intention of running for Congress in 2002.

In January 2000, Im assisted other Sam Raimsy Party members in their campaigns for local office. As a result of these activities, he received two phone calls in which the callers threatened to kill him if he did not suspend his campaign activities. Im did not stop his political activities, and twice that month unidentified individuals fired at his car. After one shooting, a witness said that a government soldier had done the shooting and then had run away. While Im reported these incidents to the police, he testified that he did not think the police took any action to find the perpetrators.

During one night in July 2000, an unknown assailant fired shots from an AK-47 rifle into Im's home. Im believed that the government was responsible for the shooting because only government soldiers were issued AK-47's. He reported the shooting to the Sam Raimsy Party, which filed a human rights complaint with the United Nations. Fearing for his life, Im fled Cambodia with his wife, arriving in Los Angeles on September 11, 2000, as a non-immigrant B-2 visitor with authorization to remain in the United States until March 10, 2001.

## II.   Procedural History and IJ Hearing

Im filed an application for asylum on March 6, 2001, identifying his wife Sitha Ngin as a derivative asylum beneficiary.[1] On July 23, 2001, the INS issued NTA's as to Im and Ngin, finding that they were subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), because of their status as non-immigrant aliens who had remained in the country beyond their required departure date. At a removal hearing held on September 13, 2001, Im and Ngin conceded that they were subject to removal. Im also renewed his applications for asylum and withholding of removal, as well as for protection under the Convention Against Torture ("CAT"). He again listed Ngin as a derivative asylum applicant.

Im and Ngin appeared before an Immigration Judge ("IJ") for hearings on April 25, 2003, June 25, 2003, and August 21, 2003. After hearing testimony from both Im and his Asylum Officer, the IJ found Im and Ngin removable as charged, denied Im's application for asylum and withholding of removal under the INA and CAT, and granted him deferral of removal under the CAT. The IJ also denied Ngin's application for asylum and ordered her removed because he did not believe that she could receive derivative relief under the CAT.

The IJ explained the rationale for his decision at the conclusion of the August 21, 2003 hearing and then again in his written order. At the hearing's end, the IJ informed Im that he was barred from receiving asylum relief or the withholding of removal because he had worked as a prison guard, which the IJ believed rendered him a former persecutor. The IJ acknowledged, however, that he was "going to find all of [Im's testimony regarding the threats to his safety] completely

---

[1]Im's wife is also a party to this appeal, separate from her status as a derivative asylum beneficiary.

believable and true," and that "there's no dispute that [the assassination attempt] happened."[2]

The IJ echoed this position in his written order, stating, "applicant presented testimony which was believable, consistent and sufficiently detailed, therefore he was found to be credible." The IJ also added "that [Im] has established by a preponderance of the evidence, that it is more likely than not he would be tortured, that is to say, subjected to extreme cruel abuse by the security forces . . . if he were returned to Cambodia."

Because of the significant risk that Im would be tortured if returned to Cambodia, the IJ granted him a deferral of removal under the CAT.

Im timely filed a notice of appeal to the Board of Immigration Appeals ("BIA") on September 12, 2003, and the Department of Homeland Security ("DHS") filed a cross-appeal, challenging the IJ's grant of deferral of removal under the CAT. While these appeals were pending, Ngin filed a motion on July 28, 2004, asking that the BIA sever her case from Im's and remand hers to the immigration court to allow her to file her own applications for asylum, withholding of removal, and protection under the CAT. On December 21, 2004, the BIA adopted and affirmed the IJ's decision, dismissed the appeals by Im and DHS, and denied Ngin's motion

---

[2]The IJ further noted that "Respondent's claim of past persecution which includes an assassination attempt on his life was attributed to members of a group associated with the government and frankly which the government is unable or unwilling to control, is documented by objective evidence including newspaper reports which are in the record." He also found that the State Department's Country Condition reports are "entirely consistent with the Respondent's claim of past persecution and his assertion of a well-founded fear of future persecution." In fact, the Cambodian Country Reports on Human Rights practices reveal that a number of Sam Raimsy Party members were assassinated in 2000, and numerous attempts were made on the lives of other party members.

to remand. Im then timely filed the instant petition for review on January 3, 2005.

## III. Analysis

### A. Standard of Review

Questions of law — including the BIA's determination that Im is ineligible for asylum or withholding of relief — are reviewed de novo. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006); *Hernandez v. Reno*, 258 F.3d 806, 812 (8th Cir. 2001) (holding that "[the] . . . conclusion that [petitioner] is ineligible for asylum or withholding relief is a legal determination which we review de novo"). Where, as here, the BIA adopts the IJ's decision as the final agency determination in a case, we review the IJ's decision. *Falcon-Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir. 2003).[3]

Moreover, where the BIA simply affirms the results of the IJ's decision and does not offer any statutory analysis or indicate that it intends to create a legal precedent — as it has in this case — the decision is not entitled to *Chevron* deference. *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 920-24 (9th Cir. 2006); *see also Hernandez*, 258 F.3d at 812 (holding that the Board's conclusion that petitioner persecuted others is a legal determination that the court reviews de novo, not a determination subject to *Chevron* deference).[4] Also, to the

---

[3]The government argues that we should review both decisions, as this court stated in *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000). This position misreads *Kataria*, which only applies when the BIA "adopts the IJ's decision while adding its own reasons." *Id.* Here the BIA never added its own reasons for affirming the IJ. Instead, it offered a perfunctory recitation of the IJ's decision, which it then affirmed.

[4]Respondent has argued only that *Chevron* deference applies, and does not assert that the agency decision in question is entitled to the lesser form of deference established by *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). But even if the government had argued that *Skidmore* deference was appropriate, the agency's determination, which referred to none of the

extent that the agency's determination is based upon an interpretation of circuit law — a factor that is unclear in this case due to the brevity of the proffered decision — the agency is not owed any deference. *See Acosta v. Gonzales*, 439 F.3d 550, 553 n.4 (9th Cir. 2006).

We accept the petitioner's testimony as true where, as here, the IJ found him to be credible. *Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004).

## B. Assistance in Persecution

**[1]** In denying Im's petition for asylum and withholding of removal under the INA and CAT, the IJ made clear that his decision was based wholly on Im's putative status as a former persecutor. "Under the INA, any person who has ordered, incited, assisted, or otherwise participated in [the] persecution of any person on account of a protected ground is ineligible for asylum and withholding of removal." *Miranda Alvarado*, 449 F.3d at 925 (citing 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i), and 8 C.F.R. § 208.13(c)(2)(i)(E)) (quotations omitted). Similarly, past persecutors are ineligible for withholding of removal under the CAT, *see* 8 C.F.R. §§ 208.16(d)(2), 1208.16(d)(2); 8 U.S.C. § 1231(b)(3)(B)(i), but are eligible for deferral of removal under the CAT. *See* 8 C.F.R. §§ 208.17(a) & 1208.17(a); *Miranda Alvarado*, 449 F.3d at 925 n.7.

In reviewing the decision of the IJ, we must consider whether the IJ adopted the appropriate legal standard for

relevant persecutor case law (of either federal or BIA extraction), does not satisfy the *Skidmore* factors. *See Miranda Alvarado*, 449 F.3d at 924 n.6 (explaining why an IJ decision did not warrant *Skidmore* deference). The factors include: "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140.

determining if petitioner assisted, or participated in, acts of persecution.[5] This inquiry encompasses two sub-issues: whether petitioner's actions constituted purposeful, material assistance for the persecution, and whether any persecutory acts were done on account of a protected ground. Because we find that Im did not assist in the persecution of others, we need not consider whether he acted on account of a protected ground.

**[2]** Individuals are only rendered ineligible for asylum if they have provided purposeful, material assistance for the acts of persecution. *See Miranda Alvarado*, 449 F.3d at 927-29; *see also Vukmirovic*, 362 F.3d at 1252; *Hernandez*, 258 F.3d at 813. "Whether [petitioner's] assistance was material is measured by examining the degree of relation his acts had to the persecution itself: How instrumental to the persecutory end were those acts? Did the acts further the persecution, or were they tangential to it?" *Miranda Alvarado*, 449 F.3d at 928.

**[3]** In answering these questions, we have relied on the Supreme Court's interpretation of a similarly worded statute, § 2(a) of the Displaced Persons Act ("DPA"), in *Fedorenko v. United States*, 449 U.S. 490 (1981). *See Miranda Alvarado*, 449 F.3d at 925; *Vukmirovic*, 362 F.3d at 1251-52. *See also Hernandez*, 258 F.3d at 813. The *Fedorenko* Court considered the actions of a Ukrainian prison guard who worked at the Nazi concentration camp in Treblinka. In discussing whether

---

[5]The IJ and BIA are required to " 'engage in a particularized evaluation in order to determine whether an individual's behavior was culpable to such a degree that he could be fairly deemed to have assisted or participated in persecution.' " *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1252 (9th Cir. 2004) (quoting *Hernandez*, 258 F.3d at 813); *see also Miranda Alvarado*, 449 F.3d at 927. This assessment of culpability requires the court to "evaluate the entire record." *Hernandez*, 258 F.3d at 814. Failure to look at the whole record is legal error. *Id.* at 814-15. While we have concerns with the evaluation performed by the BIA and IJ in this case, we need not decide whether it constituted legal error because we find that Im did not assist in the persecution of others.

Fedorenko's actions rendered him ineligible for receiving refugee status as an "individual[ ] who had 'assisted the enemy in persecuting [civilians],' " Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009 (1948), the court outlined a continuum of conduct along which an individual's actions could be situated. The Court stated:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, *and who admitted to shooting at escaping inmates* on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Fedorenko*, 449 U.S. at 512 n.34 (emphasis added).

**[4]** As we explained in *Miranda Alvarado*, while cutting an inmate's hair was "ghastly," it was not essential to the forthcoming execution and would not, standing alone, amount to persecution. 449 F.3d at 928. "Thus, the hair cutters did not 'assist or otherwise participate in' persecution." *Id.* On the more "culpable" end of the spectrum, the prison guard who shoots at escapees directly participates in their persecution: in short, "[h]ad he not shot, that particular act would not have happened."[6] *Id.*

After noting that the continuum "is not an exact or absolute

---

[6]*Miranda Alvarado* suggests that the simple act of being a guard may shade an individual toward the culpable end of the spectrum; however, as discussed *infra*, Im's conduct is more analogous to that of the hair cutter.

one . . . [and] difficult line-drawing problems will always persist," we proceeded to analyze the appropriate placement for Miranda Alvarado. *Id.* Miranda Alvarado joined the Peruvial Civil Guard in Lima, where he was employed as an interpreter for other officers who were interrogating guerrilla members. During the interrogations the suspected guerrillas were often subjected to electrical shocks or beaten with rubber batons. Miranda Alvarado denied personally torturing the suspects and said that he could do nothing about it because "it would have affected [his] performance rating and [he] would not have been promoted." *Id.* at 918. Although he claimed that he quit because of his objection to the torture, Miranda Alvarado only resigned after six years and his resignation form cited "family reasons." *Id.*

In deciding Miranda Alvarado's case, the IJ noted that Miranda Alvarado "was a necessary part of the interrogation. Without his services as a Quechua interpreter, the interrogations could not proceed. With his services, they did proceed." *Id.* at 928. We agreed with the IJ, explaining that petitioner's acts were not "peripheral to persecution. Rather, he performed an integral role in facilitating the persecution." *Id.* Miranda Alvarado translated questions between the administration of electric shocks and beatings. *Id.* "Without the translation, there would have been no reason for the torture to occur as it did, as its point was to elicit information." *Id.* Moreover, Miranda Alvarado made "no colorable claim that his actions were motivated by . . . extenuating circumstances." *Id.* at 929.

Considering the record as a whole, the court determined that Miranda Alvarado "present[ed] a case perhaps at the margin of the culpability required under the statute." *Id.* However, the court found that because his services "were integral to the particular form of persecution that occurred," his conduct fell just on the wrong side of the culpability line. *Id.*

**[5]** If Miranda Alvarado presents a case at the margin of culpability, Im falls safely on the non-culpable side, even

without considering the fact that he had no viable alternative to his job as a prison guard. The touchstone of the "assistance" analysis under *Miranda Alvarado*, and, less explicitly, under *Fedorenko*, is the degree to which petitioner's conduct was central, or integral, to the relevant persecutory acts. Unlike the proscribed conduct in *Fedorenko* (shooting prisoners) and *Miranda Alvarado* (interpreting a suspect's answers between beatings and electrical shocks), Im's actions were hardly integral to the persecution of prisoners at PJ.

Im never beat any prisoner in his time as a prison guard. He did not decide who was imprisoned in the jail, and he had no say in which prisoners were interrogated. He was never present for a single interrogation, and never saw a single prisoner beaten. Im was charged with unlocking the doors to prisoners' cells based on instructions from superiors and leading them back to their cells following interrogations. Only on one occasion did he escort a prisoner to an interrogation room. On all other occasions this was handled by guards other than Im.

**[6]** In the same way that cutting the hair of female concentration camp inmates before their execution was a trivial, albeit ghastly, administrative task that necessarily preceded the persecutory act, so too were Im's acts of opening an assigned cell door prior to interrogation.[7] While this action necessarily preceded the interrogations, it was not "integral" to them, unlike the translation services at issue in *Miranda Alvarado*. If Im did not unlock the door, any other guard could have done the same, or the interrogator could have unlocked the door himself. Im's presence or absence did not influence in any way the pace, schedule, or number of interrogations. If Im was not there, the same individuals would have been interrogated on the same days by the same interrogators.

---

[7]If anything, Im's act is probably less related to the persecution, insofar as it lacks the dehumanizing quality of the pre-execution hair-cutting.

**[7]** Insofar as Im's conduct is no more essential or integral to the persecutory acts than the paradigmatic example of non-essential assistance (hair-cutting), and clearly less central or integral than the example of borderline assistance (interpreting), Im's acts cannot constitute "assistance in persecution." In finding otherwise, the IJ committed legal error.

Because the IJ found that Im had established both past persecution and a well-founded fear of future persecution, we grant the petition for review, vacate, and remand so that the Attorney General may exercise his discretion as to whether to grant asylum. *See Quan v. Gonzales,* 428 F.3d 883, 890 (9th Cir. 2005). We also note that Ngin is eligible for asylum pursuant to the derivative status provision of INA § 208(b)(3). 8 U.S.C. § 1158(b)(3); *see also* 8 C.F.R. § 208.21 (2002). The petition for review is hereby:

**GRANTED.**