[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-11562

_____

BIA No. A98-940-047

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 17, 2008
THOMAS K. KAHN
CLERK

SU QING CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 17, 2008)**

Before ANDERSON, BLACK and HILL, Circuit Judges.

BLACK, Circuit Judge:

Su Qing Chen petitions for review of the Board of Immigration Appeals' (BIA) decision upholding the Immigration Judge's (IJ) denial of her application for asylum and withholding of removal under the Immigration and Nationality Act (INA). Chen argues the BIA erred in upholding the IJ's finding that Chen assisted in persecution and was therefore ineligible for relief. For the reasons set forth in this opinion, we DENY the petition for review.

## I. BACKGROUND

According to her undisputed testimony before the IJ, Chen began working at a governmental family planning office in her hometown of Changle City in Fujian Province, China in January 2003. She procured this employment through her uncle's influence and took it voluntarily. Chief among her duties was her responsibility to watch over pregnant women detained by Chinese authorities for violating the country's family planning policies. The authorities would detain these women in locked rooms at the facility until their scheduled forced abortions. Chen guarded the women at the facility. Authorities provided her with a rod or baton to use during her duties, although she never actually used the weapon against the detained women. She had access to the keys to the rooms in which the women were confined. When she accepted employment, Chen testified she knew the facility housed pregnant women scheduled for abortions, but she thought the

2

forced abortion program was limited to women who were one or two months pregnant.

On the evening of February 14, 2003, Chen was on duty when a group of eight women were brought into the facility and placed in locked rooms. One of the women was crying, and Chen approached her to investigate. The woman explained to Chen she was upset because she was eight months pregnant with a boy but already had another child. She begged Chen to release her so she would not have to undergo a forced abortion. Chen said she was surprised to see the family planning policy enforced on a woman so close to full term. Chen retrieved the keys to the woman's room, unlocked it, and released her. Chen then left the facility.

She returned home, and the next day family planning officials brought her to their office. They terminated her position and scolded her for releasing the detained female. Chen was told to return home, and her activities would be watched. Chen stayed with her parents for a ten days but left their home out of fear of reprisal. From February 2003 until January 2005 she stayed in China but hid from the government, staying first with her aunt and later living on her own while holding sundry jobs at factories and restaurants. She then fled China for

Thailand. Still afraid of retaliation by the government if she returned to China, Chen arranged to travel to the United States.

Chen arrived in the United States on May 21, 2005, and quickly was served with a Notice to Appear. She filed an application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), claiming she had a well-founded fear of persecution if sent back to China on account of her opposition to the family planning policy. The IJ held a hearing and, in a written opinion, denied her application. Finding Chen credible, the IJ ruled her termination by the family planning authorities did not constitute persecution. Additionally, the IJ found she had assisted in persecution and was ineligible for relief.

The BIA upheld the IJ on his finding that Chen was a persecutor and therefore ineligible for asylum and withholding of removal.[1] Relying on the statutory disqualification for those who assist in persecution, the BIA found Chen's participation as a guard at the family planning facility rose to the level of "assistance" required under the statute. Chen timely filed a petition for review of the BIA's decision.

---

[1] Chen failed to appeal the IJ's denial of CAT relief before the BIA and does not attempt to challenge the finding here.

## II. STANDARD OF REVIEW

The BIA's determinations on questions of law are reviewed de novo. *See Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1326 (11th Cir. 2003). Findings of fact must be supported by substantial evidence. *Djonda v. U.S. Att'y Gen.*, 493 F.3d 1245, 1249 (11th Cir. 2007). Findings of fact are followed unless a reasonable factfinder would be compelled to a conclusion contrary to that of the Immigration Court. *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1340 (11th Cir. 2003).

## III. DISCUSSION

This case concerns the statutory exclusion disqualifying those who assist or participate in persecution from receiving asylum or withholding of removal. The Department of Homeland Security may grant asylum to an alien present in the United States if such alien establishes status as a refugee. 8 U.S.C. § 1158(b)(1)(A). An alien is a refugee if he is unable or unwilling to return to his country of origin on account of past persecution or a well-founded fear of future persecution based on his race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 1208.13(b). Persecution for "resistance to a coercive population control program," like China's family planning policies, can constitute persecution based on political opinion. 8 U.S.C. § 1101(a)(42). Additionally, an alien subject to removal may be

5

withheld from removal if the alien's life or freedom would be threatened on grounds similar to those for demonstrating well-founded fear of persecution. *See* 8 U.S.C. § 1231(b)(3)(A).

An alien is ineligible for both asylum and withholding of removal if "the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1158(b)(2)(A)(I); *id.* § 1231(b)(3)(B)(I). If there is evidence indicating grounds for mandatory denial of an application apply, the alien must demonstrate "by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8(d).

Determining the level of conduct necessary to constitute "assistance" in persecution under the relevant statutory disqualifications is a question of first impression for this Circuit.[2] Other circuits addressing the issue uniformly seek

---

[2] We note we have previously construed identical "assistance" language found in a section of the INA commonly referred to as the Holtzman Amendment. *See Dailide v. U.S. Att'y Gen.*, 387 F.3d 1335 (11th Cir. 2004). The Holtzman Amendment applies exclusively to WWII-era Nazi persecutors. It denies admission to the United States if such an individual "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion . . . ." 8 U.S.C. § 1182(a)(3)(E).

*Dailide* involved Algimantas Dailide, who voluntarily joined the Lithuanian Secret Police under Nazi control in the early 1940s. The Secret Police generally were responsible for enforcement of Jewish curfews and ghettos, along with other various anti-Jewish laws. *Dailide*, 387 F.3d at 1338. Specifically, Dailide, as a member of the Secret Police, personally participated in persecution by capturing Jews attempting to escape the ghettos and handing them over to the Germans. *Id.* at 1339-40.

We found the BIA's determination that Dailide participated in persecution was clearly

guidance from the Supreme Court's discussion in *Fedorenko v. United States*, 449

U.S. 490, 101 S. Ct. 737 (1981). *Fedorenko* involved the Displaced Persons Act

(DPA). Enacted in 1948, the DPA allowed Europeans displaced by World War II

to emigrate to the United States outside the typical immigration channels.

*Fedorenko*, 449 U.S. at 495, 101 S. Ct. at 741. The DPA defined "displaced

persons" by adopting the definition in the Constitution of the International

Refugee Organization of the United Nations. *Id.* at 495 n.3, 101 S. Ct. at 741 n.3.

That definition excluded those who "assisted the enemy in persecuting civil

populations . . . ." *Id.* at 495 n.4, 101 S. Ct. at 741 n.4. In footnote 34 of

*Fedorenko*, the Supreme Court discussed the type of inquiry necessary for giving

content to the assistance language:

> [A]n individual who did no more than cut the hair of female inmates
> before they were executed cannot be found to have assisted in the
> persecution of civilians. On the other hand, there can be no question
> that a guard who was issued a uniform and armed with a rifle and a
> pistol, who was paid a stipend and was regularly allowed to leave the
> concentration camp to visit a nearby village, and who admitted to
> shooting at escaping inmates on orders from the commandant of the
> camp, fits within the statutory language about persons who assisted in
> the persecution of civilians.

---

supported by the record. *Id.* at 1343. Dailide both assisted in persecution and actually
persecuted several people during his association with the Secret Police. *Id.* at 1344. While the
case is factually distinct from Chen's, we note our decision today under §§ 1158(b)(2)(A)(i) &
1231(b)(3)(B)(i) is wholly consistent with the view of identical language under the Holtzman
Amendment expressed in *Dailide*.

*Id.* at 512 n.34, 101 S. Ct. at 750 n.34. Fedorenko's actions clearly amounted to assistance, as he had admitted to firing on concentration camp prisoners. *Id.* at 500, 101 S. Ct. at 744. The Court recognized closer cases would require difficult line-drawing to determine what conduct constitutes assistance. *Id.* at 512 n.34, 101 S. Ct. at 750 n.34.

All fellow circuits that have addressed this issue have used *Fedorenko*'s language to establish the standard for defining whether conduct amounts to assistance in persecution. The Eighth Circuit, in interpreting *Fedorenko*, requires "a particularized evaluation . . . to determine whether an individual's behavior was culpable to such a degree that he could be fairly deemed to have assisted or participated in persecution." *Hernandez v. Reno*, 258 F.3d 806, 813 (8th Cir. 2001). The individual's personal culpability must be assessed. *Id.* According to the Seventh Circuit, *Fedorenko* requires a distinction between "genuine assistance in persecution and inconsequential association with persecutors." *Singh v. Gonzales*, 417 F.3d 736, 739 (7th Cir. 2005). The Second Circuit distinguishes between active conduct having "direct consequences for the victims," and conduct merely "tangential to the acts of oppression and passive in nature." *Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006). The Ninth Circuit examines "the degree to

8

which [applicant's] conduct was central, or integral, to the relevant persecutory acts." *Im v. Gonzales*, 497 F.3d 990, 997 (9th Cir. 2007).

We agree with these circuits. The standard for determining whether an asylum applicant is ineligible for asylum and withholding of removal due to assistance or participation in persecution is a particularized, fact-specific inquiry into whether the applicant's personal conduct was merely indirect, peripheral and inconsequential association or was active, direct and integral to the underlying persecution.

In reviewing the cases from the other circuits, we are struck by the similarities between Chen's situation and the facts described in the Second Circuit's opinion in *Xie*.[3] In *Xie*, the asylum applicant, also an employee of the Changle City Department of Heath, was a driver for the department. 434 F.3d at 137. His duties included "mundane" tasks unrelated to forced abortions, like driving around inspection officials. *Id*. at 138. During his employment, which lasted somewhere between 18 and 24 months, he transported pregnant women to their forced abortions in his vehicle approximately three to five times. *Id.* at 137-

---

[3] We note the Ninth Circuit has applied the assistance language on facts somewhat analogous to Chen's, although not nearly as striking as the similarities to *Xie*. *See generally Im*, 497 F.3d 990. Having reviewed the Ninth Circuit's reasoning and holding in *Im*, we simply note the specific facts before us here lead us to a different conclusion.

38. On what was his final trip, Xie took pity on the woman and helped her escape. *Id. at 138.*

The Second Circuit held the BIA did not err in determining Xie's conduct amounted to assistance in persecution. *Id*. at 144. Xie's conduct was essential to the acts of persecution: "By driving the van in which the women were locked, Xie ensured that they were delivered to the place of their persecution. . . . Xie played an active and direct, if arguably minor, role." *Id.* at 143. Nor was Xie's redemptive act sufficient to protect him from the "assistance" provision of the INA. Nothing in the statute indicated Xie's particular behavior – even if admirable – negated his assistance. *Id.* at 143-44.

Chen's situation resembles that in *Xie* in several relevant ways. In both cases, the applicant's own testimony indicated he or she played a pivotal role in the persecution: Xie drove the detained women to the forced abortions, while Chen prevented women from escaping the confinements holding them for identical purposes. Both held jobs with non-persecutory aspects and did help a woman escape the persecution. The only significant difference is not particularly salient: while Xie's employment (over a year) was longer than Chen's (around six weeks), Xie's assistance was infrequent and occurred only a handful of times throughout the course of his employment.

10

Applying the standard articulated above for determining whether conduct amounts to assistance in persecution, our own analysis leads us to a conclusion similar to that in *Xie*. We hold the BIA's finding that Chen assisted in persecution was supported by substantial evidence. There is no question the forced abortions performed by the Changle City family planning authorities qualify as persecution. Chen's own testimony indicates she voluntarily took the job and understood the authorities were subjecting women to forced abortions. At the family planning facility, Chen's main duty was to monitor pregnant women being detained for the forced abortions. She had access to the keys to their rooms and was provided a weapon to use in case the women attempted escape. While she did not perform the abortions herself or ever employ violence against the women, her conduct—monitoring the confined women to ensure they did not escape—was essential to the ultimate persecutory goal of their confinement; namely, the actual abortions. Chen's personal conduct amounted to direct and integral participation in the persecution because she acted as a guard for the persecutors and prevented women from leaving the facility. Detention of an individual—when the act of detention itself is not the persecution at issue—is often an essential predicate to performing the act of persecution. Those who perform the detention—whether by the use of force, threat of force, or expression of authority meant to dominate and

11

control—are assisting in the underlying persecution. Chen's conduct as a guard at the family planning facility certainly rises to the level of culpability that qualifies as assistance in persecution.

Chen's single redemptive act, while laudatory, is not sufficient to alter this analysis. She chose to save one person from persecution only after two months spent working at the facility and supervising other women. In light of the fact that Chen voluntarily took on the employment, was paid for her work, and fully understood the policy called for forced abortions to be performed on some women, her later decision to release one person who was eight months pregnant does not absolve her of the consequences of her personal culpability for the previous assistance.[4] Chen's actions, when viewed in their entirety, amounted to assistance in persecution.

---

[4] Our analysis of this case should not be viewed as a holding that an act of redemption is never sufficient to overcome other participatory acts and save an individual from the disqualifying effect of §§ 1158 (b)(2)(A)(I) & 1231(b)(3)(B)(I). We merely hold, under Chen's facts, her redemption does not dispel the effect of her participation. Nor do we mean to imply that voluntariness is a requirement for finding assistance or participation in persecution. As the Second Circuit noted, *Fedorenko* specifically disclaimed any notion that the DPA's language included a voluntariness requirement, and there is little reason to believe the INA's similar exclusionary language requires the assistance or participation be voluntary. *See Xie*, 434 F.3d at 140-42. In any event, Chen's actions were voluntary, and we need not determine whether the analysis would change under different circumstances given the particularized nature of the inquiry.

## IV. CONCLUSION

Under the facts of this case, the BIA did not err in finding Chen assisted in persecution and was ineligible for relief. Chen's conduct—voluntarily overseeing the confinement of women scheduled for forced abortions—clearly was direct and integral to the ultimate acts of persecution performed, and her act of assisting in one woman's escape does not sufficiently mitigate the participation.[5] Chen falls squarely within the assistance language of the INA's mandatory disqualification provisions. As such, Chen is ineligible for relief under either asylum or withholding of removal and the petition for review is

**DENIED**.

---

[5] In her brief, Chen disputes the IJ's characterization of her testimony. Chen argues her testimony could be interpreted to suggest she never intended to assist in persecution and planned from the beginning to help the pregnant women at the first opportunity. To the extent she disagrees with the IJ's findings of fact, those findings can be reversed only when the record compels it. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006). Our review of the record wholly affirms the IJ's understanding of Chen's testimony, and her alternative description proffered in her brief has no basis in the record. Her argument is without merit and is rejected.