[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 09-10103
Non-Argument Calendar

_____

Agency No. A096-282-723

ERWUT TAMBE MBI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(October 6, 2009)

Before TJOFLAT, EDMONDSON and ANDERSON, Circuit Judges.

PER CURIAM:

Erwut Mbi petitions for review of the Board of Immigration Appeals'

("BIA's") decision affirming the Immigration Judge's ("IJ's") order finding her removable and denying her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Mbi argues that the IJ erred in (1) finding that her testimony was not credible and (2) finding that she did not suffer past persecution or have a well-founded fear of future persecution. For the reasons set forth below, we deny the petition.

## I. Background

Mbi, a native and citizen of Cameroon, filed an application for asylum and withholding of removal in October 2002, explaining that she feared being arrested, tortured, imprisoned, or killed if she returned to Cameroon because she had previously been detained and tortured by gendarmes on several occasions. Mbi listed her spouse as Tarhyang Tambe-Enow Mbi and stated that she was a member of the Southern Cameroon National Council ("SCNC").

In a document attached to her asylum application, Mbi stated that she had studied for one year at the University of Yaounde, but was forced to leave in 1988 after she was injured by police and gendarmes, who arrested, injured, and beat English-speaking university students protesting the President's attempt to institute a French system of education. In 1992, Mbi began attending the University of Jos, in Nigeria, where she "continued [her] student activism and occupied leadership positions at the University and National levels." Mbi served as treasurer of the

2

International Students Association, and was a member of the National Union of Cameroon Students ("NUCS"). After graduation in 1997, Mbi returned to Cameroon, where she taught at a Presbyterian girls school from September 1997 until June 2000.

Mbi stated that she became involved with political parties in 1990, when the Social Democratic Front ("SDF") was founded, and she joined the SCNC, which she described as a "liberation movement working for the restoration of the independence and sovereignty of the former British southern Cameroons." In January 2000, Mbi was arrested and detained for three weeks "as part of the crackdown on [SCNC] activists." Mbi stated that during her detention she was "stripped naked and raped, by the heavily armed Gendarmes in [L]imbe," and burned with acid, which left visible scars on her legs. She explained that she was poorly fed and forced to sleep on a wet cement floor in a room with no ventilation and terrible hygienic conditions. After she was released, Mbi began organizing events in celebration of the fortieth anniversary of Southern Cameroon's independence. During this time, Mbi responded to a summons to report to a police station and was told that she would be "arrested immediately if found to be associating with SCNC." Mbi continued her preparations for the independence celebration and, as she was marching in the streets, the police, gendarmes, and army began arresting people. Mbi fled from town and went into hiding.

3

Authorities invaded her house, arrested her husband, and questioned him for about four hours. They told her husband that if Mbi did not voluntarily appear, a warrant for her arrest would be issued and she would "be treated as a dangerous fugitive." A lawyer advised Mbi that she should leave the country. Mbi disguised herself a "an old fat woman," traveled to the American Embassy, "pleaded with the consular officer," and received a visa. Mbi stated that she arrived, in disguise, at the Douala, Cameroon, airport on May 19, 2002, bribed the police, and boarded a flight that arrived in Atlanta on May 20, 2002.

On December 17, 2002, an asylum officer interviewed Mbi. The officer's "Assessment to Refer" stated that Mbi had been involved in the NUCS and the International Students Association at the University of Jos, and that she joined the SCNC in 1999 and served as a First Assistant Public Secretary. Mbi stated that she was arrested on January 5, 1999, because she was an active member of the SCNC, and she was detained for three weeks in Buea Central Prison, where "chemicals were thrown on her legs and she was raped two times because she would not remove her clothes." After Mbi was released, her family took her to the hospital. On September 21, 2001, Mbi reported to a police station and was advised not to participate in activities against the government. On October 1, 2001, Mbi resumed her activities with the SCNC and attended a march, which was broken up by gendarmes. Mbi fled to a neighboring village to hide and avoid arrest. One week

4

later, police invaded Mbi's house and arrested her husband, who denied knowing where Mbi was hiding. Three weeks later, Mbi's husband brought a lawyer to see Mbi and the lawyer advised Mbi to leave the country. In April, Mbi traveled to Yaounde to obtain a visa. The asylum officer found Mbi's testimony to be incredible, denied her asylum application, and referred her case to the immigration court.

On January 9, 2003, the former Immigration and Naturalization Service ("INS") issued a Notice to Appear, charging that Mbi was removable under § 237(a)(1)(B) of the INA, as a non-immigrant alien who remained in the United States for a time longer than permitted. Mbi appeared before the IJ on June 4, 2003, admitted the allegations contained in the Notice To Appear, and conceded removability.

The record contained the following documentary evidence. In a "Biographic Information" sheet submitted to the INS on March 22, 2003, Mbi indicated that she had one former husband named "Enow Besong," whom she divorced on May 13, 2002. In an evaluation conducted by Dr. Susan Cookson in the United States on July 18, 2006, Mbi reported being arrested in January 2000 and detained for three weeks, during which she was beaten daily with a baton on the soles of her feet and her legs. Mbi reported being splashed with a liquid, which caused her to develop burns and blisters on her lower left leg. Dr. Cookson noted that scars on Mbi's

5

lower left leg were consistent with this report. The doctor also noted that Mbi had several well-healed scars on her left ankle and lower left and right legs. Mbi stated that, on one occasion, she was called out of her cell by a prison guard, taken to a separate room, and stripped of all her clothing. Mbi "claimed that the guards did not succeed in raping her."

A report written by Dr. Suzanne Merlis, a licensed psychologist in the United States who evaluated Mbi, indicated that Mbi "began her political activism in the 1980s as a student and was affiliated with a number of activist groups as both a student and teacher including the [NUCS], [SDF], and the [SCNC]." Mbi reported being imprisoned for three weeks in January 2000, during which she was interrogated, threatened, beaten with batons daily, and assaulted with acid. Mbi stated that, on one occasion, "she was interrogated by an officer and told to take her clothes off. When she resisted, he[] tore them off, whipped her legs, and began to rape her but was distracted by commotion in the halls and stopped." Mbi reported that the Human Rights Defense Group ("HRDG") secured her release from prison, after which she remained in a hospital for two weeks. She stated that she continued her political activities with SCNC after being released from the hospital and was told that she would be arrested if she continued her political activities. Mbi stated that she went into hiding for six months, then fled the country because she feared for her life. Dr. Merlis concluded that Mbi's

6

psychological symptoms were "consistent with those commonly found in survivors of trauma, and in particular, survivors of persecution and torture."

The record also contained a copy of SCNC membership card 003040, issued to Mbi, dated September 3, 1994.[1]  Another document, dated September 20, 2001, requests that Mbi report to Buea Police Headquarters on September 24, 2001.  A Medical Certificate, issued by the Provincial Hospital Annex – Buea, stated that "Mbi was admitted in this hospital escorted by policemen on the 27th January" and suffered chemical burns on her left ankle, as well as bruises on her right ankle.  An "admission record" indicated that Mbi was admitted at 10:00 am on January 27, 2000.  An "admission form" states that Mbi reported being detained in a police cell for 2 to 4 weeks and appeared "apprehensive and frightened" and "unkempt."  An affidavit signed by Chief Ayamba Ette Otun, the National Chairman of the SCNC, stated that Mbi joined the SCNC in September 1994 in Buea and held membership card No. 0003040.

An April 2002 "Cameroon Assessment," published by the Immigration and Nationality Directorate of the United Kingdom Home Office, stated that security forces continued to arbitrarily arrest and detain citizens.  The report specifically noted that prisoners commonly reported the use of "bastinade," "in which the

---

[1]     The date on this document is listed as "3/09/1994."   The dates listed on other Cameroonian documents in the record consistently list the day before the month; thus, it appears that the card was most likely issued on September 3, 1994, rather than March 9, 1994.

7

victim is beaten on the soles of the feet" and that "[t]he security forces,

. . . reportedly subject prisoners and detainees to degrading treatment that includes

stripping, confinement in severely overcrowded cells and denial of access to toilets

or other sanitation facilities." The assessment noted that subjects of arrest warrants

are not given copies of the warrants, nor are the subject's relatives; instead, police

simply show the subject a copy of the warrant.

The United Kingdom Home Office's "Report of Fact-Finding Mission to

Cameroon," dated January 17-25, 2004, stated that SCNC members informed the

delegation that "many of its members are harassed, followed and occasionally

beaten by the government security forces because of their alliance." An attachment

to the Home Office Report depicted a sample SCNC Membership Card. A

representative of the human rights group HRDG informed the delegation that it had

"committees in all provinces except the south."

An "Operational Guidance Note" on Cameroon, produced by the United

Kingdom Home Office, stated that between 1999 and 2002 "there were some

clashes between SCNC members and the police and some SCNC activists were

jailed for their behaviour." The report concluded, however, that "there is no

evidence to suggest that mere membership of, involvement with, or perceived

involvement in the SCNC or Southern Cameroons Youth League would in itself

lead to persecution," although "some members continue to encounter

8

discrimination or harassment."

The United States State Department's 2005 Country Report on Human Rights Practices ("Country Report") stated that the Cameroonian government continued to arbitrarily arrest and detain Anglophone citizens advocating secession, and torture, beat, and commit other abuses against detainees and prisoners. It noted that male detainees commonly reported the use of "bastonnade," "where authorities beat the victim on the soles of the feet," and "[s]ecurity forces continued to subject prisoners and detainees to degrading treatment, including stripping, confinement in severely overcrowded cells, and denial of access to toilets or other sanitation facilities." The Country Report noted that security forces arrested "approximately 100 leaders, members and supporters of the [SCNC]" during the year and that most of those arrested were not charged with a crime, but were released after brief detentions.

A letter to Mbi from Njanga Luma, the "South West Provincial Co-ordinator" of the HRDG, dated August 12, 2002, stated that Mbi must not return to Cameroon, because police and gendarmes had been to her home, harassed her family, and arrested many of her colleagues. The letter stated that "[w]e have finally got a photocopy of the warrant for your arrest." An arrest warrant dated

August 20, 2001 or August 20, 2002[2] stated that Mbi had violated the rioting, revolution, and contempt sections of the penal code.

On July 24, 2006, Mbi appeared before the IJ and testified that she was born in the English-speaking, southern part of Cameroon. She stated that she received a bachelor's degree from the University of Jos, in Nigeria. Mbi testified that she was "not really involved completely" in politics as a student at the University of Jos, although she was a supporter of the NUCS. Mbi stated that she graduated from the University of Jos in 1997, returned to Cameroon, and became active in the SCNC. Mbi distributed and produced handbills and flyers, and educated Southern Cameroonians about the importance of obtaining independence from French Cameroon. She held meetings twice a week in a field in Newtam, Limbe.

Mbi explained that on December 30 and 31, 1999, Justice Ebong, the president of the SCNC movement, declared independence for Southern Cameroon, spurring demonstrations. In response, police began arresting people and Mbi was arrested at her home in Limbe on January 3, 2000. Mbi was taken to a police station, where she was detained in a small cell that housed 15 to 20 women. She stated that she was beaten on the soles of her feet, stripped naked, raped, and beaten with a baton stick. Her leg was sprayed with chemicals that caused blisters

---

[2] The first date listed on the warrant appears to be "August 20, 2002," whereas the date next to the signature line, at the bottom of the warrant, appears to be "August 20, 2001."

to form.  The women in the cell were forced to urinate in buckets, which overflowed onto the floor on which the women slept.  Mbi testified that she was released when Mr. Muko Abey, a representative of the HRDG, intervened on her behalf and took her to the hospital.  She stated that she was released from custody on January 25.

Mbi testified that after she was released from the hospital, she ceased participation in political activities until 2001, when she resumed her activity with the SCNC in preparation for the fortieth anniversary of Southern Cameroon's independence from Britain, which was celebrated on October 1, 2001.  In response to a summons, Mbi reported to a police station on September 24, 2001, and was advised to desist from any demonstrations in preparation of the independence day anniversary, or she would be arrested.  Mbi continued her activities in preparation of independence day and marched in the streets with other demonstrators.  The police broke up the demonstrations and began arresting protestors, but Mbi managed to run away and return home.  She remained at her home for one or two days before going into hiding in a neighboring village.  Mbi stated that the police subsequently invaded her house, asked her husband where she was, and questioned her husband for about four hours.  The police told Mbi's husband that if Mbi did not return voluntarily, a warrant would be issued for her arrest and she would be "treated like a dangerous fugitive."  Mbi's husband and her family lawyer visited

11

Mbi while she was still in hiding, and the lawyer informed Mbi that her only solution was to leave the country. Mbi's lawyer and husband contacted one of Mbi's friends who lived in America, and the friend sent Mbi an "invitation letter." Mbi's husband and lawyer then traveled to Yaounde to obtain a passport for Mbi while Mbi remained in hiding. Mbi disguised herself as "a very fat old woman," traveled to the American Embassy in Yaounde, and obtained a visa to visit the United States.

On cross examination, Mbi explained that she was not admitted to the hospital until January 27, because she was released from custody around midnight on January 25, taken to her home to change clothes and take a shower, and, one or two hours later, taken to the hospital. Mbi stated that the police dropped her off in front of the hospital, where she laid for a period of time. Mbi admitted that she did not lay in front of the hospital for 24 hours.

Mbi testified that when she was detained in January 2000, she was beaten "[n]early everyday" and raped once by "[o]ne of the gendarmes." Mbi testified that she fought with the gendarme, who whipped her with a baton stick "all over" her body, especially on the bottom of her feet. Mbi became weak and fell down and the gendarme continued whipping her, jumped on top of her, and removed his pants. Mbi no longer resisted, because she was too weak. She stated that the gendarme raped her, but stopped when he heard someone coming. When the

12

government pointed out that Mbi had told a doctor and psychologist that the gendarme had only attempted to rape her, Mbi explained that the doctor might not have understood her and that she had in fact told the doctor that the gendarme raped her.

Mbi testified that she was "involved in politics in 1994 but [she] was involved fully when [she] came back from school." Mbi testified that her husband died on September 19, 2002, and that she applied for asylum in November 2002. She did not know why she included her husband on her asylum application even though she knew at the time that he was deceased.

Mbi testified that after she left the country, Cameroonian authorities gave the warrant for her arrest to her husband and her husband mailed her a copy. Mbi did not know how her husband obtained a copy of the arrest warrant. The government noted that Mbi's SCNC membership card did not resemble the example of an SCNC membership card listed in the 2002 Cameroon Assessment and Mbi explained that the card shown in the 2002 Cameroon Assessment might have been an old card.

Mbi acknowledged that she listed only one former husband on her asylum application, even though she actually had two former husbands – one who she divorced in 1986 and one who died in July 2002. She noted that, during her asylum interview in January 2003, she did not inform the asylum officer that her

13

most recent husband had died in July 2002. Mbi testified that Abet Mukong, the national president of the HRDG, had secured her release from jail and that the HRDG was, in fact, active in South Cameroon.

After Mbi testified, Lawrence Eyong-Echow, who identified himself as chairman of the SCNC in the United States, testified that the British Home Office Country Report depicted an old SCNC membership card. He stated that Mbi's membership card was an example of a recent SCNC membership card that would have been issued "from 2000 forward."

The IJ found that Mbi's testimony was not credible and specifically listed the following discrepancies in Mbi's testimony: (1) Mbi testified that she became active in politics only after attending the University of Jos, but on the application, she stated that she was active as a student at the university; (2) in her written statements, Mbi stated that she divorced her husband in May of 2002, but she testified that her husband died in July of 2002; (3) Mbi's asylum application was filed on October 21, 2002, but did not list her husband as deceased; (4) Mbi's own witness testified that her SCNC membership card, which stated that it was issued in 1994, was in the form of a membership card that was not issued until 2000; (5) Mbi provided a copy of her arrest warrant, dated August 2001, but the 2002 Home Office Country Report stated that the Cameroonian government did not provide a copy of the warrant to either the subject of a warrant or to his or her relatives; (6)

14

Mbi provided a letter from "the [HRDG], Southwest Provincial Coordinator, dated August 12, 2002," but the 2004 Home Office Fact-Finding Mission Report stated that the HRDG did not have a committee in South Cameroon. The IJ also noted discrepancies in Mbi's various descriptions of her rape while in custody. Finally, the IJ pointed out that Mbi's passport was issued on November 14, 2001, when she was supposedly in hiding and there was supposedly an outstanding warrant for her arrest. The IJ also noted internal inconsistencies in Mbi's documentary evidence. The IJ determined that there was no evidence to suggest that mere membership in the SCNC would lead to persecution and denied Mbi's application for asylum, withholding of removal, and CAT relief, granting her the privilege of voluntary departure.

The BIA affirmed the IJ's adverse credibility determination and its finding that Mbi failed to meet her burden of proof. It noted that Mbi provided "differing stories as to how she got from her detention to the hospital and how much time elapsed between her release and arrival at the hospital." It also noted numerous discrepancies in Mbi's various descriptions of the alleged rape or attempted rape. Finally, the BIA noted that Mbi's own witness testified that Mbi's SCNC membership card was a type of card that did not come into use until 2000. Based on these findings, the BIA affirmed the IJ's denial of asylum, withholding of removal, and CAT relief.

15

## II. Law & Analysis

We review only the BIA's decision, except to the extent that the BIA expressly adopts the IJ's opinion or reasoning. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, the BIA expressly adopted the IJ's order, so we review the IJ's order. When reviewing an order of the IJ, we review legal issues de novo. Hernandez v. U.S. Att'y Gen., 513 F.3d 1336, 1339 (11th Cir. 2008). The IJ's factual findings are reviewed under the substantial evidence test. Al Najjar, 257 F.3d at 1283. Under this test, we must affirm the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1284.

*Adverse Credibility Determination*

We review credibility determinations under the substantial evidence test. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1230-31 (11th Cir. 2006). Under the substantial evidence test, we must affirm the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1284. The IJ's credibility determinations "can be reversed only if the evidence compels a reasonable fact finder to find otherwise." Chen, 463 F.3d at 1230-31 (internal quotations omitted).

"[T]he IJ must offer specific, cogent reasons for an adverse credibility finding. Once an adverse credibility finding is made, the burden is on the applicant

16

alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (internal citations and quotations omitted).

The REAL ID Act explicitly provides that an adverse credibility determination may be based on any inconsistencies, regardless of whether the inconsistency goes to the heart of the claim. See REAL ID Act § 101(a)(3)(B)(iii), Pub.L.No. 109-13, 119 Stat. 231 (2005), codified at 8 U.S.C. § 1158. However, Mbi's asylum claim is not governed by the REAL ID Act, because her asylum application was filed in 2002. See Chen, 463 F.3d at 1231 (holding that the provisions of the REAL ID Act pertaining to credibility determinations apply only to asylum applications filed after May 11, 2005). We have not determined whether credibility determinations, in cases not governed by the REAL ID Act, must be supported by inconsistencies that go to the heart of the claim, and we need not make that determination in this case, because the majority of the inconsistencies relied upon by the IJ do, in fact, go to the heart of Mbi's asylum claim.

The first inconsistency cited by the IJ was Mbi's conflicting statements regarding when she first became involved in politics. Because Mbi's asylum application was based on persecution that she allegedly suffered on account of her political opinion, the discrepancies in these statements go to the heart of Mbi's

17

claim. In an attachment to her asylum application, Mbi stated that she "continued [her] student activism and occupied leadership positions at the University and National levels" while studying at the University of Jos from 1993 until 1997 and that she became involved in political parties in 1990. This stands in stark contrast to Mbi's statement to Dr. Merlis, that she "began her political activism in the 1980's as a student," and her testimony at trial, that she was "not really involved completely" in politics as a student at the University of Jos.

The IJ also cited inconsistencies regarding Mbi's former husbands. Although these inconsistencies do not go to the heart of Mbi's asylum claims, notable inconsistencies do exist. For example, on her asylum application, submitted in October 2002, Mbi listed her spouse as Tarhyang Tambe-Enow Mbi. However, in a Biographic Information sheet submitted to the INS, Mbi indicated that she had a former husband, named Enow Besong, who she divorced on May 13, 2002, and at the removal hearing Mbi testified that she actually had two former husbands – one whom she divorced in 1986 and one who died in July 2002. Next, the IJ noted discrepancies regarding Mbi's SCNC membership card. These are important discrepancies, as Mbi's asylum claim is wholly based on her membership in the SCNC. The membership card Mbi presented did not resemble the example contained in the British Home Office Report, which, according to Echow, was an accurate representation of an "old" SCNC membership card.

18

Because Mbi's card was issued in 1994, the year the SCNC was founded, it would be reasonable to expect that the card would resemble the example in the Home Office Report. Moreover, Echow specifically stated that a card such as Mbi's was issued only "from 2000 forward," although the card was dated September 3, 1994.

With regard to Mbi's arrest warrant, an April 2002 Cameroon Assessment published by the British Home Office indicated that Cameroonian authorities did not provide citizens with copies of arrest warrants and Mbi could not explain how her husband was able to obtain a copy of the warrant for her arrest. The IJ also noted that although Mbi presented a letter from the "Southwest Provincial Coordinator" of the HRDG, dated August 12, 2002, the Home Office's Fact-Finding Mission Report, published in January 2004, indicated that the HRDG had no committees in Southern Cameroon. It is unlikely that HRDG would have a "Southwest Provincial Coordinator" if it had no committees in South Cameroon. Mbi also failed to explain the discrepancy.

Perhaps most important to Mbi's asylum claim was her claim that she was raped while in prison. As noted by the IJ, Mbi's various descriptions of the rape contained inconsistencies. First, in the attachment to her asylum application, Mbi states that she was "stripped naked and raped." Later, Mbi told the asylum officer that she was raped twice; however, she told Dr. Cookson that "the guards did not succeed in raping her." Mbi told Dr. Merlis that a gendarme "began to rape her but

19

was distracted by commotion in the halls and stopped," and she testified at her hearing that she was raped once. Although Mbi's statements to Dr. Merlis and her hearing testimony could be construed to be consistent, Mbi's statement to the asylum officer, that she was raped twice, and her statement to Dr. Cookson that the guard did not rape her, are wholly inconsistent with her other accounts.

The final discrepancy noted by the IJ was the fact that Mbi was able to obtain a passport while Cameroonian authorities were searching for her. The IJ's determination that this was improbable is supported, because it is highly unlikely that the very government that was searching for Mbi, causing her to go into hiding, would issue her a passport to flee the country.

In addition to the discrepancies noted by the IJ, the BIA noted that Mbi's statements regarding how and when she arrived at the hospital were inconsistent. Mbi told the asylum officer that her family transported her to the hospital, while hospital records indicated that she was escorted by police. In fact, Mbi's testimony at her removal hearing was internally inconsistent, because she first stated that the HRDG representative took her to the hospital, but later stated that police escorted her. Furthermore, although hospital records indicate that Mbi was admitted at 10:00 am on January 27, Mbi testified that she was released from prison around midnight on January 25, taken to her home where she remained for 1 to 2 hours, then transported to the hospital. This would place Mbi at the hospital at

approximately 1:00 or 2:00 am on January 26. Mbi admitted that she did not lay in front of the hospital for 24 hours and, thus, has failed to adequately explain the discrepancy.

The inconsistencies relied upon by the IJ were numerous and material. The only discrepancy that arguably did not go to the heart of Mbi's asylum claim was the discrepancy involving Mbi's former husbands. Even ignoring this discrepancy, the remaining inconsistencies upon which the IJ relied are sufficient to support the adverse credibility determination. Accordingly, the record does not compel reversal of the IJ's credibility determination. See Chen, 463 F.3d at 1230-31.

### *Denial of Asylum, Withholding of Removal, and CAT Relief*

An alien may establish eligibility for asylum if she shows that she has suffered either "past persecution" or has a "well-founded fear" of future persecution. 8 C.F.R. § 208.13(b); Chen v. U.S. Att'y Gen., 513 F.3d 1255, 1257 (11th Cir. 2008). "To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007) (emphasis in original). A well-founded fear may be established by showing (1) past persecution that creates a presumption of a "well-founded fear" of future persecution, (2) a reasonable possibility of being singled out for persecution that cannot be avoided by relocating within the subject country, or (3)

21

a pattern or practice in the subject country of persecuting members of a statutorily defined group of which she is a part. 8 C.F.R. § 208.13(b)(1), (2), (3)(i).

An alien is entitled to withholding of removal under the INA if she can show "that [her] life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). This standard is more stringent than the "well-founded fear" standard for asylum; thus, if an applicant is unable to meet the "well-founded fear" standard, she necessarily is unable to qualify for withholding of removal. Al Najjar, 257 F.3d at 1292-93. To be eligible for CAT relief, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. at 1303, quoting 8 C.F.R. § 208.16(c)(2).

"[A]n adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Forgue, 401 F.3d at 1287. If the applicant produces corroborating evidence of his persecution, "it is not sufficient for the IJ to rely on an adverse credibility determination." Id.

Because the IJ's adverse credibility determination is supported by substantial evidence, Mbi must rely on other evidence in the record to support her applications for asylum and withholding of removal. However, the only account of the persecution Mbi allegedly suffered was provided through Mbi's testimony and

22

written statements. Although medical reports and evaluations described Mbi's physical and emotional conditions, they did not establish that Mbi's conditions were caused by her being beaten and raped while in prison. Accordingly, the IJ correctly determined that Mbi failed to present credible evidence showing that she was subjected to past persecution.

Because Mbi failed to show that she suffered past persecution, she is not entitled to a presumption that she possesses a well-founded fear of future persecution and she must show either (1) a reasonable possibility of being singled out for persecution that cannot be avoided by relocating within the subject country, or (2) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which she is a part. See 8 C.F.R. § 208.13(b)(1), (2), (3)(i). Mbi failed to show that she would be singled out for persecution upon returning to Cameroon, because the copy of the arrest warrant she provided contradicted the 2002 Cameroon Assessment, which stated that the Cameroonian government does not give out copies of arrest warrants. At her hearing, Mbi failed to explain how her husband obtained the warrant. Furthermore, Mbi was able to obtain a passport to leave Cameroon, even though she asserted that authorities were actively searching for her. This would suggest that even if local authorities were in fact searching for Mbi, she was not being sought on a national level and relocation within the country would be possible.

23

Mbi also failed to establish a pattern or practice of persecution against SCNC members. Although documentary evidence suggests that SCNC members continue to be harassed in Cameroon, the "Operational Guidance Note" produced by the United Kingdom Home Office specifically stated that SCNC members who did not occupy leadership positions were not in danger of suffering persecution. In light of this evidence, Mbi has failed to establish a well-founded fear of future persecution and the IJ, after examining all the evidence in the record, correctly denied Mbi's asylum application.

Because Mbi failed to meet her burden of proof on her asylum claim, she necessarily failed to meet the higher burden of proof required for withholding of removal and CAT claims. See Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1297 (11th Cir. 2006). Accordingly, we deny Mbi's petition for review.

**PETITION DENIED.**